# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-CA-00192-SCT

*GALLAGHER BASSETT SERVICES, INC.*

*v.*

*CHARLES H. "BO" JEFFCOAT, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/9/1998 |
| TRIAL JUDGE: | HON. ROBERT L. GIBBS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRISTOPHER THOMAS GRAHAM |
| | MICHAEL A. HEILMAN |
| ATTORNEYS FOR APPELLEE: | PHILLIP J. BROOKINS |
| | JOHN LEONARD WALKER |
| | WILLIAM WALKER |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 09/09/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This appeal involves the civil liability for compensatory and punitive damages of an insurance adjuster, Gallagher Bassett Services, Inc. (Gallagher), arising from its adjusting work on Charles "Bo" Jeffcoat, Jr.'s uninsured motorist claim.

¶2.     On October 21, 1994, after unsuccessful attempts to recover under his employer's automotive insurance policy, Jeffcoat filed suit in *Jeffcoat I*.  This suit named Cleo Bogan, Gallagher Bassett Services, Inc., and Reliance Insurance Company as defendants.  The complaint sought compensatory damages from

Bogan, as well as compensatory and contract damages from Gallagher and Reliance Insurance Company. It also requested punitive damages. The Hinds County Circuit Court entered a default judgment on the issue of negligence against Bogan because she did not defend against Jeffcoat's claims.

¶3.    The contract claim in *Jeffcoat I* alleged that Gallagher failed, refused and neglected to: properly determine the amount of coverage available under the policy; promptly investigate and determine what portion of coverage the companies believe to be applicable the Jeffcoat's claims, and; pay or offer to pay any amount of the uninsured motorist coverage. The complaint alleged that Gallagher had offered only one excuse for its delay, namely, that it was unable to determine the number of vehicles covered under the policy.

¶4.    On June 23, 1995, Jeffcoat filed suit in *Jeffcoat II* against Bogan, several entities affiliated with Reliance,[1] and Juana Love, the Gallagher employee who adjusted Jeffcoat's claim. This suit alleged that Reliance, Gallagher, and Love violated their respective contractual obligations to Jeffcoat by failing to: admit the amount of coverage available under the policy; investigate and determine the amount of coverage available on Jeffcoat's claim; and offer any excuse for their delay other than their inability to determine the number of vehicles covered under the policy. The complaint asserted that a fiduciary relationship existed between Reliance, Gallagher, and Jeffcoat. According to the complaint, after Jeffcoat made a claim for UM benefits, Gallagher and Love had a duty to promptly investigate and determine the amount of coverage available; pay such benefits; disclose all material facts to Jeffcoat; and to act in good faith and deal fairly with Jeffcoat. The suit alleged that Gallagher and Love willfully, wantonly, and with gross negligence breached their respective duties of good faith and fair dealing to Jeffcoat. Further, the suit alleged that

[1]These entities are Reliance Indemnity Company, Reliance National Insurance Company, Reliance Insurance Company of Illinois, United Pacific Insurance Company, and Gallagher.

2

Reliance, Gallagher, and Love conspired to defeat Jeffcoat's uninsured motorist claim and his negligence claims. The suit requested damages of $1,000,000 against Gallagher.

¶5. The trial court granted Jeffcoat partial summary judgment in *Jeffcoat I*, finding that the policy produced by Reliance and Gallagher was a true and correct copy and it included a provision for UM coverage. The Reliance entities subsequently settled with Jeffcoat for $1,850,000, and Jeffcoat by settlement agreement released those entities from any further claims.

¶6. Jeffcoat moved to consolidate the two lawsuits. After a hearing, the trial court consolidated the two cases and ordered Jeffcoat to file an amended complaint regarding his claims against the defendants. Jeffcoat filed his amended complaint, which removed the Reliance entities but retained Gallagher, Love, and Bogan as defendants. The amended complaint alleged that Gallagher's and Love's actions were grossly negligent, malicious, and/or evidenced reckless disregard for Jeffcoat's rights. Moreover, it alleged that Gallagher exhibited a pattern of false statements and representations to Jeffcoat and the court. The complaint alleged that Gallagher sought to fraudulently and unlawfully circumvent enforcement of certain Mississippi insurance laws. Jeffcoat alleged that as a result of Gallagher's unreasonable delay and failure to promptly determine and pay the amount of coverage under the policy, he experienced extreme emotional trauma and severe depression. Jeffcoat asserted that Gallagher's actions triggered post-traumatic stress disorder and that he would continue to suffer damages to his mind, body, and economic opportunity. His complaint requested punitive damages. After a bench trial on the issue of damages caused by Bogan's negligence, the trial judge awarded Jeffcoat $1,900,000. Jeffcoat testified that he did not collect any of this judgment.

¶7. The case went to trial, and the jury returned a verdict against Gallagher for $3,000,000 in actual damages and $500,000 in punitive damages. The jury returned a verdict in favor of Juana Love. After the

3

close of Jeffcoat's case, Gallagher moved for a directed verdict. The trial court denied this motion. After entry of judgment in accordance with the verdict, Gallagher filed a motion for j.n.o.v. and new trial, as well as a motion for setoff. The court denied these motions as well.

## FACTS

¶8. On June 23, 1992, Jeffcoat was driving an automobile owned by his employer, NHL. A car driven by Cleo Bogan collided with another vehicle driven by Mary King. This collision resulted in King's vehicle crashing into the side of Jeffcoat's vehicle. Jeffcoat sustained a herniated disk in his spine which necessitated surgery.

¶9. Bogan's vehicle was uninsured, and King was without fault. Therefore, Jeffcoat attempted to obtain payment under NHL's uninsured motorist insurance ("UM") policy. Planet Insurance Company was the insurer of the vehicle. Planet subsequently changed its name to Reliance National Indemnity Company ("Reliance"). Gallagher had contracts with NHL and Reliance to adjust claims under the policy. Thus, Gallagher was the separate, independent adjusting company that was contractually obligated to adjust this claim. Jeffcoat notified Gallagher of his claim on May 10, 1994, nearly two years after his accident. Upon receipt of the claim, Mary Cole, a Gallagher claims supervisor, assigned the claim to Juana Love, a claims representative.

¶10. Pursuant to its contract with Reliance, Gallagher was authorized to settle claims for $10,000 prior to the filing of a lawsuit. That is, prior to Jeffcoat's suit, Gallagher had the authority to settle with Jeffcoat for up to $10,000. Love stated at trial that there was no question that Jeffcoat's claim had a value in excess of $10,000. Love stated that it was, therefore, "just a matter of getting the medical bills to document the $10,000 and issue a check to Mr. Jeffcoat." Love opened the file and requested Jeffcoat's medical

4

authorization. In July 1994, Jeffcoat sent Gallagher his medical bills and the signed medical authorization form. As of July 18, Love believed that she did not have all the pertinent bills or records.

¶11. In a subsequent telephone conversation, Jeffcoat's lawyer informed Juana Love that stacking is available in Mississippi. Love stated that she was familiar with stacking in a general sense, but she did not know how it applied in Mississippi. After learning that stacking was potentially available, Love called the insurance broker and Pam Mason at Reliance to determine how many vehicles were in the NHL fleet. To verify that stacking was available, Love looked at an automotive liability guide, which discussed anti-stacking provisions and stated that stacking is allowed in Mississippi. Based on the conversation with Jeffcoat's lawyer and what she learned in her own research, Love decided that she would need a legal opinion to determine if stacking applied to Jeffcoat's claim; that is, Love stated she "definitely needed someone who was familiar with [stacking in Mississippi] to basically tell [her] how this all applied." She stated that adjusters at Gallagher have access to local defense counsel in jurisdictions with which they are not familiar. At the time she received Jeffcoat's claim, Love had never handled a Mississippi stacking case, and it did not occur to her that stacking might be available in Mississippi until Jeffcoat's lawyer told her.

¶12. Love believed that she could not obtain a legal opinion on the issue of stacking until she found a "fleet schedule," which purportedly listed the number of vehicles in the NHL fleet. A section on the second page of the insurance policy lists NHL's covered vehicles. In that section, the "description" box reads "as per schedule on file with company." Love testified that this representation "gives the impression that there is a schedule somewhere that lists all of the vehicles on this particular policy." This was the representation she was relying on when seeking the fleet schedule. Cynthia Friedhoff, Love's supervisor, testified that the number of covered vehicles was not in the policy. Therefore, on September 28, 1994, Friedhoff contacted Reliance and requested the number of covered vehicles so that the policy limits could be determined.

5

Friedhoff again requested this information from Reliance on December 9, 1994. In response, Richard Colantuono, Claim Account Manager at Reliance, stated that Reliance's underwriting department did not have any information on the number of vehicles in NHL's fleet. He expressed surprise that neither the broker nor the insured had that information. Colantuono stated in an affidavit that he was unable to find a schedule of vehicles covered under the policy.

¶13. In the premium endorsement of the policy, there was an estimated annual premium for the policy. In that section, there was reference to the "rate per power unit," and the "number of units" was listed as 3664. Friedhoff testified that "unit," as used in this portion of the policy, meant nothing to her. She said she was looking for the number of vehicles in the fleet. The purported fleet schedule was never discovered.


¶14. Although local defense counsel was available to her, Love never requested a legal opinion on the issue of stacking because the number of vehicles covered under the policy was never determined. Love testified that it was her intention to consult legal counsel, but she believed that the number of vehicles would be required for an attorney to give an opinion on stacking in Mississippi. In addition, Friedhoff never requested a legal opinion on this issue.

¶15. Gallagher never gave Juana Love any training on stacking. At the time stacking was raised by Jeffcoat's attorney, Love did not know what an anti-stacking provision was. Love indicated at trial that she could not think of anyone with whom she could have consulted within the Gallagher organization for an opinion on stacking. She also stated that she could not think of anyone within Gallagher that could have provided such an opinion. Love was unaware of any Gallagher training manual that discusses uninsured motorist claims.

¶16.   Friedhoff's claim notes indicate that when the stacking issue came up, Colantuono stated Gallagher should quit "wasting everyone's time" and that he would find the policy for defense counsel when he had time.  Juana Love did not receive a copy of the policy until September of 1994.

¶17.   Neither Juana Love nor Gallagher was licensed to adjust insurance claims in Mississippi.  Love was, however, licensed in Texas, New Mexico, and Montana.  Gallagher did not have a license from May, 1994 to May 1996.  During this time,  Richard McKinna, Gallagher's vice president for claim management, was under the impression that the company was "licensed or allowed to handle claims in the State of Mississippi."  As a result of Jeffcoat's lawsuit, Gallagher obtained a license because it "wanted to make a good faith effort to insure that [it] was properly licensed in the State of Mississippi."

¶18.   There was conflicting expert testimony regarding Gallagher's conduct in adjusting this claim.  Michael Hale, an insurance adjuster, testified that, in his expert opinion, "the investigation of Mr. Jeffcoat's claim by Gallagher Bassett Services, Inc. was not timely, not adequate or reasonable, and not properly focused.  And that the delay in providing benefits to Mr. Jeffcoat was based on inconsistencies, untruths, deceit, and amounts to gross negligence and outrageous conduct."  However, Gallagher's expert, Jack Gandy, stated that a complete lack of cooperation by Colantuono and Reliance caused Love and Friedhoff to be unable to process and pay Jeffcoat's claim. According to Gandy, neither Gallagher, Friedhoff, nor Love did anything willful, wanton, or grossly negligent toward Mr. Jeffcoat.

¶19.   There was conflicting evidence regarding Jeffcoat's damages. Jeffcoat's physician referred him to Dr. Mark Webb, a psychiatrist and expert witness in this action. Dr. Webb initially diagnosed Jeffcoat with major depression, which he treated with antidepressants.  After more visits, Dr. Webb concluded that Jeffcoat suffered from post-traumatic stress disorder (PTSD). Dr. Webb opined that Jeffcoat's PTSD was caused by interaction with Gallagher.  Specifically, he testified that Jeffcoat's contact with Gallagher

7

reignited symptoms and feelings he experienced during his service in the Vietnam War. Jeffcoat has trouble sleeping, and the PTSD has caused him to be very short-tempered and irritable with his family. Moreover, Dr. Webb testified that Jeffcoat would be unable to obtain gainful employment again. He also testified that Jeffcoat's medicines cost $500 per month and that Jeffcoat would never be able to stop taking the medication.

¶20. On the other hand, Gallagher's expert, Dr. Patrick Smith, a psychologist, testified that there had never been a thorough diagnostic work-up on Jeffcoat. He concluded that there is no evidence Jeffcoat suffers from PTSD and that there is not enough information in the record to determine whether Jeffcoat has the disorder. He stated that in his opinion a delay in handling an insurance claim would not meet the criteria for a traumatic event, the occurrence of which is a necessary element of PTSD.

¶21. The UM policy limit was set at the statutory minimum of $10,000. Miss. Code Ann. § 83-11-101(Rev. 1999). Gallagher never denied Jeffcoat's claim or recommended such a denial. It paid the $5,000 medical benefits under the policy on March 30, 1995, after Jeffcoat filed suit and almost one year after he gave notice of his claim. It paid $10,000 under the uninsured motorist provision on September 7, 1995.

## DISCUSSION

### I. Gross negligence, reckless disregard, or malice: the *Bass* standard.

¶22. Because they each challenge the legal sufficiency of the evidence presented at trial, the denials of peremptory instructions, motions for directed verdict, and motions for judgment notwithstanding the verdict are reviewed under the same standard. *Moore v. State*, 859 So.2d 379, 383 (Miss. 2003). This Court has held:

8

Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgement might have reached different conclusions, affirmance is required.

*Id.*

¶23.    Gallagher first contends that the proof was insufficient to establish its liability for its actions in adjusting Jeffcoat's claim this Court's holding in ***Bass v. California Life Ins. Co.***, 581 So.2d 1087 (Miss. 1991).  In ***Bass***, the plaintiff was a member of a group health insurance plan.  *Id.*  California Life was the group insurance carrier and used an administrative organization, Variable Protection Administrators, Inc. ("VPA"), to manage the insurance plan.  *Id.*  In March of 1985, the plaintiff sought medical advice on three different occasions for the same medical condition.  *Id.*  She subsequently had surgery to correct her problems.  *Id.*  After each of these visits, she submitted a claim to VPA.  *Id.*  The first claim was allowed, but the others were denied.  *Id.*  The plaintiff corresponded with VPA through her attorney and appealed the denial.  *Id.* at 1089.  VPA sent the letter to California Life.  *Id.*  Upon receipt of the letter, California Life ordered VPA to immediately pay the claims plaintiff submitted.  *Id.*  This payment was made in October of 1985.  *Id.*  Plaintiff filed suit against California Life and VPA for bad faith denial of her claims.  *Id.*

¶24.    At trial, the evidence showed that VPA was responsible for drafting the policy of insurance underwritten by California Life.  *Id.*  VPA "received applications, reviewed claims for coverage, received premiums, and had the authority to pay claims up to $10,000 without prior approval from the carrier."  *Id.*

9

In the master insurance policy, VPA was designated as a third-party who was "contracted to act as the benefit coordinator and marketing arm" of the group plan. *Id.*

¶25. The trial court granted California Life's motion for directed verdict, holding that VPA had no duty of good faith under Mississippi law. *Id.* Reversing the judgment of the court below, this Court held that an insurance adjusting company can be liable for gross and reckless negligence. *Id.* at 1090. That is, an insurance adjuster, agent or other similar entities may not be held liable for simple negligence in connection with adjusting a claim. *Id.* Rather, an adjuster "can only incur independent liability when his conduct constitutes gross negligence, malice, or reckless disregard for the rights of the insured."*Id.* (quoting*Dunn v. State Farm Fire & Cas. Co.*, 711 F. Supp. 1359, 1361 (N.D. Miss. 1987)).

¶26. While this Court has not utilized the *Bass* standard, the federal courts and the Mississippi Court of Appeals have considered and applied it. *See, e.g.,**Howard v. CitiFinancial,Inc.*, 195 F. Supp.2d 811, 819 (S.D. Miss. 2002), *aff'd sub nom.*, *Ross v. CitiFinancial, Inc.*, 344 F.3d 458 (5th Cir. 2003); *Skinner v. USAble Life*, 200 F. Supp.2d 636, 640 (S.D. Miss. 2001) (pointing out federal court's expression of "uncertainty" regarding this Court's creation of separate standard of care for agents such as insurance adjusters); *Russell v. New York Life Ins. Co.*, 1997 WL 170317, *4 (N.D. Miss. 1997) (stating that this Court's holding in *Bass* "muddied the waters a bit in this context"); *Rasberry v. Blue Cross & Blue Shield of Mississippi*, 850 So.2d 1194, 1200 (Miss. Ct. App. 2002) (affirming summary judgment in favor of third party insurance administrator and holding that no bad faith was shown).

¶27. As two federal court opinions make apparent, the absence of cases which discuss and apply the *Bass* standard has caused some confusion. However, we take this opportunity to revisit our holding in *Bass* and conclude it plainly states and we now reiterate that an insurance adjuster, agent or other similar

10

entity may not be held independently liable for simple negligence in connection its work on a claim. Such an entity may be held independently liable for its work on a claim if and only if its acts amount to any one of the following familiar types of conduct: gross negligence, malice, or reckless disregard for the rights of the insured. We will now analyze the voluminous record here in light of this standard to determine whether Gallagher was grossly negligent, malicious, or exhibited reckless disregard for Jeffcoat's rights.

¶28.    It is clear to us that Gallagher's acts in the adjustment of this claim were, at the most, negligent. Gallagher never denied or recommended denial of this claim, but it did not pay any benefits on the policy until ten months after Jeffcoat made the claim. The payments of medical and uninsured motorist benefits were both made after Jeffcoat filed suit.

¶29.    Moreover, Gallagher did not provide training or resources to support its adjusters' work on uninsured motorist claims. Gallagher failed to give its adjusters any resources or training regarding stacking in Mississippi. Although she was generally familiar with stacking, Love did not know that stacking was available in Mississippi or how it works until Jeffcoat's lawyer informed her that it is and explained how it works. Love knew that she needed a legal opinion on this issue, but she failed to request one. It escapes us why Love would wait until the fleet schedule was discovered to request an opinion. Clearly, Love could have obtained a legal opinion on whether and how stacking applies in Mississippi without knowing the number of vehicles in the NHL fleet.[2]

¶30.    Love admitted at trial that local defense counsel was available to her if she was unfamiliar with the laws of a particular jurisdiction, but she did not consult an attorney. Friedhoff likewise failed to request a

_____

[2]The dissent states, "there is more to this case than the fact that Love needed to obtain a legal opinion and failed to do so...." We agree. This case involves our first application of **Bass**, allegations of serious injuries, and a $3.5 million judgment. It strains credibility to imply that our view of this case goes no further than Love's failure to request a legal opinion.

legal opinion. When Jeffcoat's attorney notified Love that stacking might be available on this claim, she was unfamiliar with anti-stacking provisions. After receipt of the policy in question, Love reviewed it to determine if the policy contained such a provision, even though such clauses are against the public policy of this State.[3] Thus, it is clear to this Court that Love was not trained in any aspect of handling uninsured motorist claims in the State of Mississippi. Further, neither Gallagher nor Love was licensed to adjust insurance claims in Mississippi at the time of this claim.

¶31.    Notwithstanding this evidence, Gallagher argues that it did not violate this Court's standard for insurance adjuster liability as set out in *Bass*, 581 So.2d at 1088. We agree. Considering the evidence in the light most favorable to Jeffcoat and giving him the benefit of all favorable inferences that may be reasonably drawn from it, we hold that there is *not substantial evidence supporting the verdicts*. At the very most, Gallagher and Love were negligent in their handling of Jeffcoat's claim. As demonstrated, supra, there is substantial evidence supporting such a conclusion. However, their acts do not rise to the standard for insurance adjuster liability as set out by this Court in *Bass*.

¶32.    A careful review of the Court's analysis in *Bass* shows that insurance agents, adjusters, and similar entities cannot be held liable for simple negligence. This well-reasoned opinion adopts the rule that a higher standard should be applied in cases such as the one sub judice.

¶33.    Gallagher's adjustment of this claim evinces a complete breakdown of communication and cooperation between two contractually obligated parties, supervisors and subordinates within Gallagher, as well as between two principals and their agent. Important documents related to this policy were not

---

[3]"[A]s a matter of public policy...stacking of UM coverage is mandatory for every vehicle covered under a policy and...anti-stacking clauses as applied to UM coverage are unenforceable." *Miss. Farm Bureau Cas. Ins. Co. v. Britt*, 826 So.2d 1261, 1264 (Miss. 2002).

shared with Gallagher either by accident or willfully. The carrier's representatives were uncooperative with Gallagher, bringing the resolution of Jeffcoat's claim to a standstill, or as Love described it, an "impasse."

¶34.    Gallagher argues that it was in a position of irreconcilable conflict, but such conflict is inherent to the business in which Gallagher operates. It is obvious to anyone who has ever written or purchased an insurance policy that an insured and an insurance carrier have independent interests in connection with a claim. The insurer seeks to minimize loss while the insured seeks to maximize benefits under the policy. When a third-party administrator becomes involved, as is the case here, that adds yet another set of interests and differing duties to this complicated risk-allocation and prevention calculus.

¶35.    Although Gallagher and Love were negligent at the most, we find no evidence of gross negligence, malice, or reckless disregard for Jeffcoat's rights under NHL's uninsured motorist policy. Therefore, we find that Gallagher did not violate the *Bass* standard, and the trial court erred in denying Gallagher's motion for judgment notwithstanding the verdict.

## II.

## Conspiracy.

¶36.    Jeffcoat alleged conspiracy in his amended complaint:

> 3.16...Gallagher, *in concert with Reliance Insurance*, through common lawyers, hired by Gallagher, filed false pleadings, and wrote letters representing to Plaintiffs, and the court, that Reliance National Insurance Company issued the policy.
>
> * * *
>
> 3.19...*By concert of action*, Reliance National Insurance Company, with Gallagher, sought to fraudulently and unlawfully circumvent enforcement of the laws of the State of Mississippi regulating insurance contracts so as to unlawfully take from Plaintiffs their monies due.

(Emphasis added). Gallagher does not take issue with Jeffcoat's failure to list or otherwise discuss conspiracy as a separate ground of liability. The trial court instructed the jury that the elements of a civil conspiracy are:

(1)     two or more persons or corporations;
(2)     an object to be accomplished;
(3)     a meeting of the minds on the object or course of action;
(4)     one or more unlawful overt acts; and
(5)     damages as the proximate result

Further, the trial court instructed that the jury could enter a verdict in favor of Jeffcoat if it found from a preponderance of the evidence that Gallagher conspired with NHL or Reliance to accomplish an unlawful purpose or a lawful purpose unlawfully.

¶37.    Under Mississippi law, "[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Levens v. Campbell*, 733 So.2d 753, 761 (Miss. 1999). Where a civil conspiracy gives rise to damages, a right of recovery may arise. *Roussel v. Hutton*, 638 So.2d 1305, 1315 (Miss. 1994). It is elementary that a conspiracy requires an agreement between the co-conspirators. *See Brown v. State*, 796 So.2d 223, 226-27 (Miss. 2001) (conspiracy is "a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy," and the "persons must agree...in order for a conspiracy to exist").

¶38.    We find that the trial court erred in denying Gallagher's motion for judgment notwithstanding the verdict on the issue of conspiracy. First, there is not substantial evidence supporting the conclusion that there was a "combination" of entities for the purpose of accomplishing an unlawful purpose. That is, there is no evidence of any agreement, either open or tacit, between these entities such that a "combination of persons" was formed for an unlawful purpose. Further, assuming arguendo that Gallagher did agree to

14

violate various insurance statutes, there is not substantial evidence that the conspiracy caused Jeffcoat any damages.

### III. Statutory violations.

¶39.    Jeffcoat alleged at trial that Gallagher violated the following statutes: Miss. Code Ann. §§ 83-17-29 (licensing requirement for adjusters), 83-17-17 (criminal penalties for unlicenced insurance adjusters), 83-17-19 (criminal penalties for adjusting unlawful policy), and 83-17-403 (criminal penalties for unlicenced person holding herself out as insurance adjuster).

¶40.    "To prevail in an action for negligence per se, a party must prove that he was a member of the class sought to be protected under the statute, that his injuries were of a type sought to be avoided, and that violation of the statute proximately caused his injuries." *Snapp v. Harrison*, 699 So.2d 567, 571 (Miss. 1997) (citing *Thomas v. McDonald*, 667 So.2d 594, 597 (Miss. 1995)).  A finding of negligence per se does not end the inquiry - "[n]egligence per se supplies only the **duty** and the **breach of a duty** elements of a tort." *Delahoussaye v. Mary Mahoney's, Inc.*, 783 So.2d 666, 671 (Miss. 2001) (emphasis added).  The plaintiff must also prove that the breach of the duty **proximately caused** her damages.  *Id.*  The Court has stated

> The principle that violation of a statute constitutes negligence per se is so elementary that it does not require citation of authority. When a statute is violated, the injured party is entitled to an instruction that the party violating is guilty of negligence, and if that negligence proximately caused or contributed to the injury, then the injured party is entitled to recover.

*Thomas v. McDonald*, 667 So.2d 594, 596 (Miss. 1995) (citing *Bryant v. Alpha Entertainment Corp.*, 508 So.2d 1094, 1096 (Miss. 1987)).

15

¶41.    Gallagher argues that Jeffcoat's allegations of statutory violations fail as a matter of law because the statutes Jeffcoat cites and argues do not provide private rights of action. Further, Gallagher claims that the statutes apply only to insurance companies; therefore, they do not apply to Gallagher.

¶42.    We find that the trial court erred in denying Gallagher's motions for directed verdict and j.n.o.v. on the issue of statutory violations. Under *Bass*, an insurance adjuster may not be held liable for simple negligence in connection with its work on an insurance claim. Because negligence per se is a method of establishing the elements of simple negligence for violation of a statute, we find that such a claim is ineffective for establishing an insurance adjuster's liability arising from its adjustment of a claim.

## IV.    Fraud.

¶43.    The elements of fraud are well settled:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speakers intent that the representation be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the representation's truth; (8) the hearer's right to rely thereon; and, (9) the hearer's consequent and proximate damages..

*Gamble ex rel. Gamble v. Dollar General Corp.*, 852 So.2d 5, 10 (Miss. 2003) (citing *Allen v. Mac Tools, Inc.*, 671 So.2d 636, 642 (Miss. 1996)). The complaint alleges that Love knowingly misrepresented her request for a legal opinion on the issue of stacking. In his brief, Jeffcoat argues that he offered compelling evidence fraud in this case. He avers that he presented the following undisputed facts: Gallagher failed to reveal the role of NHL in denying claims while misrepresenting that the claim was being considered by Reliance, and; Gallagher asserted false reasons for delaying his claims when it knew the reason NHL was determined to deny Jeffcoat any recovery because he had collected workers' compensation benefits.

¶44.    Gallagher claims that the representations between Love and Jeffcoat regarding Love's request for a legal opinion were a misunderstanding.  It maintains that Love sought to obtain a legal opinion, but additional information was needed in order to accomplish this.   In a letter to Jeffcoat's attorney dated August 25, 1994, Love stated:

> As we discussed, I am in the process of researching the fleet stacking issue as you indicate that Mr. Jeffcoat would be entitled to multiply the UM limits on this policy by the number of vehicles covered on the policy.
>
> At such time that we are in a position to settle this claim, I will supply [you] with a copy of the applicable policy provisions. **I am requesting a legal opinion regarding the stacking of fleet coverages as related to this case and will be in touch with you in the near future to discuss same**.

(emphasis added).  On September 12, 1994, Jeffcoat's attorney stated in a letter to  Love that

> Pursuant to our telephone conversation of today, September 12, 1994, in which you told me that you had requested a legal opinion on your company's position that coverage will not stack on a "fleet" policy, I enclose the following Mississippi Supreme Court case...

Love responded to Jeffcoat's attorney by letter, stating that

> What I have told you today on September 12th is true.  **We are awaiting a legal opinion and are in need of additional policy information in order to receive an opinion**.  I advised that we have a full copy of the policy, but no indication is given as to the number of vehicles covered on the policy.  Reliance is checking on this.

(emphasis added).  Moreover, Gallagher argues that the element of reasonable reliance is lacking in this case.

¶45.    Considering the documentary evidence and trial transcript in the light most favorable to Jeffcoat, we find that the evidence does not support a finding of fraud in this case.  The correspondence between Gallagher and Jeffcoat indicates that Juana Love continually represented that she was obtaining a legal opinion.  However, as discussed, supra, she never obtained one.  There is no evidence that Love ever

explicitly represented that she had obtained a legal opinion. She stated that she was "requesting" and "awaiting" a legal opinion on the issue of stacking but was in need of more policy information before such an opinion could be obtained. She testified that she intended to obtain one. Therefore, we find that the first element of fraud is lacking in this case; that is, there was never any representation that a legal opinion had been obtained. Read in context, Love simply stated that she was going to obtain an opinion once she had certain policy information.

¶46. We have examined Jeffcoat's remaining assertions regarding fraud, and we have considered carefully all the evidence regarding those contentions. It is true that Jeffcoat collected workers' compensation benefits in connection with this accident. However, there is no evidence that Gallagher asserted false reasons for delaying Jeffcoat's claims because he obtained workers' compensation benefits. In addition, we find that there was not sufficient evidence to support a finding that Gallagher committed fraud by failing to reveal the role of NHL in denying claims while misrepresenting that the claim was being considered by Reliance. We conclude that Jeffcoat's proof wholly failed to establish the necessary elements of fraud. Accordingly, we hold that the trial court erred in denying Gallagher's motions for directed verdict and j.n.o.v. on the issue of fraud.

## CONCLUSION

¶47. For the foregoing reasons, we reverse the circuit court's judgment and render judgment here that Jeffcoat take nothing and that his amended complaint and this civil action are finally dismissed with prejudice.

¶48. **REVERSED AND RENDERED.**

**WALLER, P.J., AND DICKINSON, J., CONCUR. COBB, P.J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

18

**CARLSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**

**CARLSON, JUSTICE, DISSENTING:**

¶49.	Because the majority reverses and renders, thus overturning the jury's verdict in this case, I respectfully dissent. We have set forth our standards of review for denial of a motion for directed verdict, new trial, and judgment notwithstanding the verdict in ***Sentinel Industrial Contracting Corp. v. Kimmins Industrial Service Corp.***, 743 So.2d 954, 960 -961 ¶ 15 (Miss. 1999) (citing ***Steele v. Inn of Vicksburg, Inc.***, 697 So.2d 373, 376 (Miss. 1997)):

> This Court's standards of review regarding a denial of a judgment notwithstanding the verdict and a peremptory instruction are the same. Our standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are also identical. Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law. ***Sperry-New Holland, a Div. of Sperry Corp. v. Prestage***, 617 So.2d 248, 252 (Miss. 1993) (citations omitted).

> > "This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion." ***Shields v. Easterling***, 676 So.2d 293, 298 (Miss. 1996) (quoting ***Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n.***, 560 So.2d 129, 132 (Miss. 1989)).

> ***Steele***, 697 So.2d at 376.

¶50.	In the underlying case, when viewing the evidence in a light most favorable to Jeffcoat, there was substantial evidence in support of the verdict of sufficient quality and weight so that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions. As indicated

19

by the jury's 11-1 decision, different conclusions were reached. There were several issues submitted to the jury. Because the jury returned a general verdict, we know that the jury found Gallagher liable on at least one count.

¶51. Here the jury returned a verdict in favor of Love. This is no wonder since Jeffcoat's counsel described her as "a victim of circumstances" during the closing argument and that "she's in a culture where if she wants to continue to keep her job, she has to do these things." Jeffcoat underscored this point by showing that Love was promoted after the handling of Jeffcoat's claim.

¶52. As to the first count, in order to find Gallagher liable, the jury had to find that Gallagher acted with gross negligence, malice, or reckless disregard for the rights of Jeffcoat. *Bass v. Cal. Life Ins. Co.*, 581 So.2d 1087 (Miss. 1991). In *Bass*, we found:

> An adjuster has a duty to investigate all relevant information and must make a realistic evaluation of a claim. *Banker's Life & Casualty Co. v. Crenshaw*, 483 So.2d 254, 272, 276 (Miss. 1985). However, an adjuster is not liable for simple negligence in adjusting a claim. *Leathers v. Aetna Casualty & Surety Co.*, 500 So.2d 451 (Miss. 1986); *Consolidated American Life Ins. Co. v. Toche*, 410 So.2d 1303, 1305 (Miss. 1982). He can only incur independent liability when his conduct constitutes gross negligence, malice, or reckless disregard for the rights of the insured. *Davidson v. State Farm Fire and Casualty Co.*, 641 F.Supp. 503, 510 (N.D. Miss. 1986); *Leathers v. Aetna Casualty & Surety Co.*, 500 So.2d at 453; *Progressive Casualty Ins. Co. v. Keys*, 317 So.2d 396, 398 (Miss. 1975).

*Bass*, 581 So.2d at 1090 (citing *Dunn v. State Farm Fire & Cas. Co.*, 711 F. Supp. 1359, 1361 (N.D. Miss. 1987)).

¶53. The majority points out that Gallagher was negligent by not paying benefits on the policy until ten months after the claim, that Gallagher failed to provide training or resources as to uninsured motorist coverage and stacking to its adjusters, and that its adjuster failed to obtain a legal opinion on the issue. Furthermore, no one at Gallagher was licenced to adjust insurance claims within the State of Mississippi.

20

¶54.    But there is more to this claim than that.  The jury was correctly instructed that Gallagher had the duty to:

       (1)      conduct an adequate investigation and realistic evaluation of the claim;

       (2)      tell Jeffcoat the plain truth;

       (3)      give equal consideration to the interest of Jeffcoat on each and every consideration;

       (4)      refrain from using the investigation for improper purposes -- that is to refrain from finding a way to deny a claim; and

       (5)      refrain from intentionally and maliciously delaying adjustment of the claim.

Even Gallagher's own expert, Jack Gandy, testified that Jeffcoat was owed the duty to be treated fairly in the handling of the claim.  According to Richard McKinna, Gallagher's Vice President, the task of the claims adjuster is to administer claims, investigate losses, fairly evaluate the losses, communicate to the insured and insurance company, and to negotiate and compromise settlements of claims.  It is not for the adjuster to decide if coverage is available.

¶55.    Michael Hale, Jeffcoat's expert, testified that the investigation was not timely, not adequate or reasonable, and not properly focused.  Telephone notice of the claim was received in April of 1994.  Gallagher's own manual mandates timely response requirements; however, nothing happened on this claim until the claim was assigned to Love on May 17, 1994.  Contrary to Gallagher's guidelines, no statements were taken or even requested to be taken of Jeffcoat.  The statement of the uninsured driver, Cleo Bogan, was not taken until August 25, 1995.  Mary King, the third driver involved in the accident, was never contacted.

¶56.    Love's evaluation of Jeffcoat's losses was insufficient.  By May 24, 1994, Love was aware that Jeffcoat's losses would be greater than $10,000.  Love received copies of the medical records and bills

from Jeffcoat, as well as a medical authorization, by July 1994. However, Love never utilized that medical authorization to ensure that she had all the medical reports and bills. Love did not raise her evaluation of the losses suffered by Jeffcoat until March of 1995 when she valued the claim at $150,000 to $175,000.

¶57. Instead, prior to Jeffcoat filing the first lawsuit in October of 1994, the coverage issue was Love's sole focus. Yet, Gallagher's own witnesses testified that determination of coverage was not their responsibility, that coverage was left to the determination of Reliance. Nor did Gallagher properly train Love or provide the proper resources for Love to handle this claim. Gallagher does not provide a training program for adjusters. Love had never handled an uninsured motorist claim involving stacking in the State of Mississippi and was not aware that stacking was available in Mississippi until Jeffcoat's attorney told her. Love could not find a manual that discussed uninsured motorist coverage, nor was she trained on Miss. Code Ann. § 83-17-21. Love did not know what an anti-stacking provision was or what Mississippi's law concerning anti-stacking provisions. Anti-stacking provisions were considered contrary to public policy. ***Miss. Farm Bureau Cas. Ins. v. Britt***, 826 So.2d 1261, 1264 (Miss. 2002). Except for the Automobile Liability Insurance Guide, Love had no library or other written resources to get the information needed. In contradiction of Mississippi law, this Guide indicated that stacking was not available on fleet policies.

¶58. Love continually told Jeffcoat's attorney that she was waiting on a legal opinion, yet she never even requested one. Love did not have anyone within Gallagher to ask for an opinion on stacking. Although Gallagher had in-house counsel, Love would have had to obtain the opinion from outside local counsel. Neither Love nor Friedhoff even requested an opinion. Furthermore, Gallagher's authority to adjust claims in the State of Mississippi had been revoked by the Commissioner of Insurance. Neither Love nor Friedhoff was licensed in Mississippi.

¶59.    Up until the filing of the lawsuit, Gallagher never indicated to Jeffcoat that his injuries may not be covered.  However, immediately upon the suit being filed, Gallagher began looking for an anti-stacking provision in the policy.  Gallagher also began seeking a rejection of UM coverage.  Gallagher also began taking the position that the policy did not apply to Jeffcoat and that Jeffcoat failed to comply with the policy provisions.  Gallagher also refused to pay the med-pay benefits because it believed that workers' compensation had already paid Jeffcoat's out-of-pocket expenses.  It was not until March of 1995 and the issue of UM coverage was before the court that Gallagher even began evaluating Jeffcoat's claim.  When Gallagher did evaluate the claim and  Reliance agreed to the evaluation, settlement authority had to come from NHL since the settlement amount was within NHL's $500,000 deductible.  NHL was unwilling to extend authority because Jeffcoat had already filed workers' compensation and Americans with Disabilities Act claims.

¶60.    Gallagher did not disclose to Jeffcoat that NHL had a $500,000 deductible and, in Love's own words of June 13, 1995, that "it is quite obvious that [corporate counsel for NHL] does not want to pay anything on this case" because Jeffcoat has already received workers' compensation benefits.  Certainly, there is more to this case than the fact that Love needed to obtain a legal opinion and failed to do so because she could not determine the number of vehicles in NHL's fleet and that NHL, the broker, and Reliance were not cooperating.  Even the majority indicates that there was "a **complete** breakdown of communication and cooperation."  However, the majority empathizes with Gallagher's argument that as a third-party administrator, it was in a position of irreconcilable conflict between the insured, the insurer, and Jeffcoat.  However, Gallagher voluntarily and contractually placed itself in this position. This Court has already taken this contractual position into account in adopting the *Bass* standard.  Viewing the evidence presented at the trial in the light most favorable to Jeffcoat, I believe that Jeffcoat has shown that

23

Gallagher's actions meet this standard. As a result, I respectfully disagree with the majority and would affirm the jury's verdict against Gallagher.

¶61. Even though there were other issues presented to the jury in the form of a general verdict, with the affirmation of this one count, the verdict will stand. *Miss. Cent. R. Co. v. Aultman*, 173 Miss. 622, 160 So. 737 (1935). Because the majority found no liability by Gallagher, the majority did not address the remaining issues presented by Gallagher. However, inasmuch as I would find that there was sufficient evidence presented to support the jury's verdict, I am compelled to at least mention the remaining issues. Gallagher raises a total of thirteen issues: nine issues directed to the trial court's failure to grant a directed verdict and JNOV, one issue directed to jury instructions, and one issue related to set-off. In this dissent, I will also address the set-off issue.

¶62. Gallagher also raised the issue of set-off, claiming that any judgment against it should be set-off by the amount that Jeffcoat settled with the Reliance entities for the same claims. After the two lawsuits were consolidated, Jeffcoat settled with Reliance on all claims for $1,850,000. Gallagher argues that under Mississippi's "one satisfaction rule," it is entitled to setoff for all money paid by Reliance. *See Turner v. Pickens*, 711 So.2d 891, 893 (Miss. 1998); *McBride v. Chevron U.S.A.*, 673 So.2d 372, 380 (Miss. 1996). Conversely, Jeffcoat asserts that he is entitled to fully recover all damages suffered by him, including (1) the damages suffered as a result of the automobile accident, (2) damages resulting from Gallagher's and Reliance's handling of his UM claim, and (3) punitive damages. Based upon these damages, according to Jeffcoat's calculation, he is entitled to $5.5 million ($2 million default judgment against uninsured Bogan, the $3 million damages as a result of the "bad faith" handling of his claim, and $.5 million punitive damages).

¶63. When Jeffcoat released the Reliance entities, he received settlement funds:

24

for mental and emotional distress and other injuries and damages we claim were caused by the manner in which the claims under the policy were handled by Gallagher Bassett Services, Inc. . . . its agents and employees and certain alleged wrongful acts of [Reliance], all as more fully described in the pending lawsuits. . .

Thus, Gallagher is entitled to set-off the money paid by Reliance. "All of the Mississippi authorities on this point clearly and unequivocally state that where a party settles with one defendant, any remaining defendant receives credit for the settlement received from the released defendant." *Hunnicutt v. Wright*, 986 F.2d 119, 125 (5th Cir. 1993)(citing *Bailey v. Delta Elec. Light, Power & Mfg. Co.*, 86 Miss. 634, 38 So. 354 (1905);*Medley v. Webb*, 288 So.2d 846, 848-49 (Miss. 1974); and *Gillespie v. Brewer*, 10 So.2d 197 (Miss. 1942)). Accordingly, the judgment against Gallagher should be reduced to $1,650,000.

¶64. For these reasons, I would affirm the judgment as to liability, but apply a set-off to the amount awarded to Jeffcoat.

**GRAVES, J., JOINS THIS OPINION.**

25