# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00336-SCT

*ILLINOIS CENTRAL GULF RAILROAD*
*COMPANY*

*v.*

*WILLIAM K. MILWARD*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/20/2004 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HARRIS FREDERICK POWERS, III |
| | GLENN F. BECKHAM |
| ATTORNEYS FOR APPELLEE: | WILLIAM K. DUKE |
| | BARBARA MILLER DOLLARHIDE |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND RENDERED - 03/31/2005 |
| MOTION FOR REHEARING FILED: | 04/14/2005; DENIED AND OPINION |
| | MODIFIED AT ¶¶ 35-38 - 06/09/2005 |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., EASLEY AND CARLSON, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

### PROCEDURAL HISTORY

¶1. William K. Milward (Milward) filed his complaint against Illinois Central Gulf Railroad

Company (Illinois Central) and two crew members, J.A. Whitaker and J.M. Cobb, in the Circuit

Court of Quitman County, Mississippi, for injuries and damages received as a result of a car-train accident at the Green River Road rail crossing in DeSoto County, Mississippi, on August 8, 1998.[1]

¶2. The trial court denied in part and granted in part Illinois Central's motion for summary judgment, and the case was tried solely on Milward's claim that Illinois Central negligently maintained the crossing. The jury returned a verdict finding Milward to be 40% at fault for the accident, Illinois Central to be 60% at fault and Milward's total damages to be $662,268.96. The jury was polled, and the verdict ratified by 11 of the 12 jurors.

¶3. Following the return of the jury verdict and conclusion of the trial, the trial court altered or amended the jury verdict and entered judgment in amount of $662,268.96.

¶4. The trial court denied Illinois Central's post-trial motions for a judgment notwithstanding the verdict (J.N.O.V.), to alter or amend the judgment, for a new trial and a remittur. Illinois Central now appeals to this Court.

## FACTS

¶5. On August 8, 1998, Milward, employed by Harrah's Casino in Robinsonville, Mississippi, worked the 10:00 a.m. - 6:00 p.m. shift. After work he changed out of his uniform and went to the Gold Strike Casino to gamble. While at the Gold Strike, Milward played video poker and drank beer. According to Milward, he had only two 12 oz. beers. He did not eat any food while at the Gold Strike. Milward testified that he left the casino between 7:30 - 7:40 p.m. Milward testified that he was headed home to Olive Branch, Mississippi. He traveled on Green River Road.

---

[1] Whitaker, the train's locomotive engineer, and Cobb, the train's conductor, were later dismissed before the case was given to the jury. Therefore, only Illinois Central will be referenced.

¶6.     According to Milward, when he got to Green River Road, the weather conditions were horrible. Due to the heavy, sheeting rain and wind, he experienced poor visibility. In fact, he stated the windshield wipers could not clear the rain and his headlights could not penetrate the rain. However, Milward did not pull off the road or stop his vehicle. Milward was extremely familiar with his route home on Green River Road, having driven it at least 260 times each way in the last year. Milward was familiar with the railroad crossing beyond the intersection of Highway 3 and Green River Road and knew that it was in active use. He stated that once he passed through the intersection he was traveling four to five miles per hour as he approached the railroad crossing. He was aware that he was approaching the crossing.

¶7.     Due to the weather, Milward had to look through the corner of the windshield and his side view mirrors to be certain that he was still on the road. Milward admitted that he did not see the train or hear anything until he felt a "bump." Milward realized that he had driven into the side of the train. He then could see the train's wheels. The train was coming from Milward's right.

¶8.     Milward testified that he had hearing loss in his right ear when his mother was x-rayed while pregnant with him. He testified that the volume and direction of sound affected his ability to hear. He also testified that he had his radio off and could not have heard the radio anyway because of the hard rain hitting the truck. Milward testified that except for the severe weather conditions, he could have seen the train.

¶9.     After the accident, Milward was transported to the Med, a hospital in Memphis, Tennessee, for treatment. The Med drew a blood sample from Milward at 9:39 p.m. According to Dr. David T. Stafford, Illinois Central's toxicology expert, Milward's blood alcohol concentration was 0.09

3

grams per deciliter. According to Dr. Stafford, Milward's blood alcohol concentration level was not consistent with his testimony that he consumed only two 12 oz. beers prior to the accident. Dr. Stafford estimated that at the time of the accident, approximately 8:20 p.m., Milward would had a blood alcohol concentration of 0.10 to 0.11 grams per deciliter. Dr. Stafford testified that a blood alcohol level of 0.10 or above would impair the motor skills of a motorist affecting vision and braking ability.

¶10. Whitaker, the train engineer, testified by deposition that neither he nor the conductor, Cobb, ever saw Milward's vehicle. Whitaker testified that there was a terrible rain storm, the wind was blowing 60-70 miles an hour, and visibility was poor. All he could see because of the rain were the rails right in front of him and signals and the whistle posts to the side when they got close to them. He could see the crossing at Green River Road when he got to it. He testified that because of the rain, he blew the whistle when he thought he was near the crossing and until he was over the crossing. He testified the term whistle and horn were the same thing. When asked if he remembered anything that would have obstructed Milward's view of the train, he stated "just the weather."

¶11. James Shoemaker, Illinois Central's track inspector, testified at trial by deposition. He had worked for Illinois Central since June 16, 1976. Shoemaker stated that he worked a particular area between Lambert, Mississippi, and Lakeview, Mississippi, which included the Green River Road Crossing. He inspected this crossing in August, 1998. Shoemaker testified that his duties as a track inspector included:

> Q.	What are your duties?
> A.	Well, a track inspector['s] duty is to inspect track to be sure that the track is safe for train operation at a safe, efficient, operating timetable speed to move

the train safely over track. Looking for broke rails, strip joints, deviation['s] of the track, profiling the track, lateral movement, missing spikes, effective cross ties, being sure that crossings are safe, got crossbuck poles up, signs that are visible for a person to see, being sure that vegetation is down for approaching vehicles to be able to pull up to a crossing and be able to look and be able to see a train . . .

Q. So, in general, as a track inspector for Illinois Central, you inspect not only the rails and the cross ties, but I guess the right-of-way, the surrounding area?

A. Yes, ma'am . . .

Q. But your job includes the responsibilities with regard to vegetation and any signals at the crossing, even electronically? I mean, that you would just report. But certainly if there are crossbucks there, signs, then your job covers that area to inspect?

A. Yes, ma'am. If – I would be sure that the crossbuck poles and signs are up and visible for peoples in the vehicles to be able to see them.

¶12. He inspected the whole track twice a week with a one-day interval in between. He also inspected the crossing from a motorist's point of view. He testified that before August 8, 1998, the only work done recently was some cleaning in that area, but the crossbuck pole sign was still good and in good visible condition.

¶13. Shoemaker testified that Illinois Central has a spray train that comes in the spring and fall of each year. If clearing needs to be done at a crossing they bring in a track hoe or backhoe, and if tree cutting needs to be done in order to keep the crossing as safe as possible, Illinois Central does that. The "spray train" sprays on each side of the crossing about 500 feet. Illinois Central's "spray" reports indicate that May 1, 1998, was the last time the Green River Road area was sprayed prior to the August 8, 1998 accident.

¶14. Dr. Kenneth Heathington, of Knoxville, Tennessee, was called by Milward as an expert. Dr. Heathington testified that he was a civil engineer. His fields of consultation in transportation were listed as: highway safety, highway design, traffic engineering, accident reconstruction and human factors

related to those things. He also consulted in the field of railroad crossing operation. Dr. Heathington inspected the crossing at Green River Road, on May 3, 1999.

¶15. During his scene analysis, Dr. Heathington observed that there was an advance pavement marking on the road leading up to the crossing, crossbuck sign in place at the crossing and a strip line. Of the signs present at the crossing, only the crossbucks are specifically regulated and controlled by the railroad.

¶16. He stated that in his opinion the crossbuck at Green River Road was not maintained at all and in deplorable condition. He testified that Illinois Central had no devices present at the Green River Road crossing to aid a driver, such as Milward, in detecting the presence of the crossing by sight. Dr. Heathington also testified that at the subject crossing, there were severe restrictions in the quadrant where the accident occurred. Dr. Heathington testified that, in his opinion, the railroad's failure to maintain the crossing and remove vegetation proximately caused or contributed to the accident:

> He [Milward] had no way to detect the train or detect the crossing. I mean he couldn't see anything. I mean it's no way you could see the crossbuck sign, you couldn't see the train. You don't know where you are, and it happens to be a heavy downpour and at night. He'd have had the same problems in detecting the crossing if it wasn't raining.

¶17. Carolyn Burns Hatfield testified that in 1998 she worked for the DeSoto County EMS. She reviewed exhibit D-56 which she identified as a State EMS Run Report that she wrote on August 8, 1998. She was the head paramedic on the ambulance unit sent to the accident scene. The report listed Milward as the patient. The 911 call was received at 8:22 p.m. or 20:22 in military time. She stated that she arrived on the scene at Lakeview on Green River Road at 20:32 or 8:32 p.m. The report was introduced as exhibit D-56. The report listed ETOH in capital letters. Hatfield testified

6

that those letters indicated that the patient had possibly consumed alcohol. From the smell, Hatfield stated that she suspected consumption of alcohol. Milward admitted to her that he had been drinking. She stated that he was belligerent slurring his words.

¶18. On appeal, Illinois Central raises twelve issues but we need only to address one:

**I.    Whether the trial court erred in denying Illinois Central's motions for directed verdict and/or J.N.O.V. and denial of D-4 peremptory jury instruction.**

### DISCUSSION

**I.    Direct Verdict/J.N.O.V.[2]**

¶19. Illinois Central moved for a directed verdict at the close of Milward's case-in-chief. The trial court denied Illinois Central's motion. Illinois Central also made a post-trial motion for judgment notwithstanding the verdict (J.N.O.V.), and the trial court also denied the motion for J.N.O.V.

¶20. The standard of review for a denial of a directed verdict and a motion for a judgment notwithstanding the verdict is the same. *Steele v. Inn of Vicksburg, Inc.,* 697 So.2d 373, 376 (Miss. 1997). We employ de novo review of a trial court's decision regarding a motion for directed verdict. *Fulton v. Robinson Indus., Inc.,* 664 So.2d 170, 172 (Miss. 1995). As such, we examine the evidence in the record in the same light as the trial court. *Id.* We consider the record at the last time the trial court had the issue before it, on motion for J.N.O.V.

¶21. Denials of peremptory instructions, motions for directed verdict and motions for judgment notwithstanding the verdict each challenge the legal sufficiency of the evidence presented at trial and

---

[2] Illinois Central also takes issue with the trial court's refusal to grant D-4 peremptory instruction which states: "The court instructs the jury to return a verdict for Illinois Central Railroad Company." This instruction will not be addressed.

each are reviewed under the same standard. ***Community Bank v. Courtney,*** 884 So. 2d 767, 772 (Miss. 2004). This Court has held that under its standard of review, denial must be reviewed as follows:

> This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered points so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

***Id.*** Applying that standard of review here, we conclude that the evidence was legally insufficient to establish Illinois Central's liability.

¶22. Milward testified that on August 8, 1998, he was employed at Harrah's Casino in Robinsonville, Mississippi, as a dealer. He worked the 10:00 a.m. to 6:00 p.m. shift that day. After work, he changed into his regular street shirt and drove to the Gold Strike Casino to play video poker. According to Milward, he left the Gold Strike between 7:30 and 7:40 p.m. and headed home. Milward testified that he consumed two 12 oz. bottles of Heineken beer at Gold Strike and did not eat anything.[3]

¶23. When Milward left the Gold Strike, he took the exit road to Highway 61 and turned right onto Highway 61. He then took Green River Road to the intersection of Highway 3.

---

[3] Milward's blood sample was taken at 9:39 p.m. at the Med, the hospital in Memphis, Tennessee, where Milward was transported after the accident. The test showed that he had a blood alcohol level of .09. The accident occurred at approximately 8:20 p.m.

¶24.	Milward testified that when he left the Gold Strike it was already raining. As he traveled down Green River Road, the rain began to get harder. By the time he reached Highway 3 and Green River Road, "it was raining really, really hard."

¶25.	Milward stated:

> As I proceeded down the road the rain and wind got worse and worse. It began to blow so hard that the windshield wipers couldn't clear the water off of the windshield. In order to be sure that I wasn't running off the road, I was having to look off the side window because you couldn't see through the front windshield. I was looking outside at the white line on the side of the road to be sure that I was still on the road. That's when I felt the bump . . .[s]everal seconds after I did that that I could look out and the rain had ceased enough, I guess, that I could see the wheels of the train. I thought to myself at the time, damn, I hit a train, and that's the first indication I had that there was something in the way of the road on Green River.

Milward testified that he was going approximately four to five miles an hour tapping his brakes when he hit the side of the train.

¶26.	Milward was familiar with the route and the railroad crossing. He stated he had driven that route to and from work for over a year. He estimated that he had been through that railroad crossing at least approximately 260 times westbound and 260 times eastbound. Milward testified that he was very familiar with this railroad crossing. He stated that when you approach the crossing there is an elevation where you come up a hill and there is a crossbuck sign.

¶27.	According to Milward's testimony, had the weather not been as it was that night, there would have been no reason that you could not have seen a train coming. The rain was so heavy and the wind blowing so hard that Milward's headlights were not able to penetrate the rain which prevented him from seeing far in front of him. Even though sheets of rain were coming down and his visibility was impaired, he did not pull off the road or stop and turn on his flashers. Milward testified that, "I don't

9

make a habit of pulling off the side of the road in those kind of conditions." Finally, he stated, "I would not stop at a road or pull off on a shoulder under any conditions. That's just not what I'm going to do."

¶28. Milward testified that he did not hear the train's whistle blow. He did not have the air conditioner or radio turned on in the truck. In fact, Milward testified that:

> The rain was hitting the - - it's a little pickup truck and it's not a lot of insulation in it. The rain was hitting the roof so hard that you couldn't have heard the radio if it had been turned on, so I had not turned it on.

¶29. According to the testimony, Milward suffered a loss of hearing in his right ear as a result of his mother being x-rayed during her pregnancy with him. The radiation also caused radiation burn, loss of muscle tissue, kidney disfunction in the right kidney and scarring in the chest cavity and inside the stomach. Milward testified that the direction and volume of the noise affect his ability to hear the sound. The train was traveling toward Green River Road from Milward's right. Milward testified that he did not hear the horn blow. However, when asked whether he could state under oath that the horn did not blow, he stated: "No, sir. I'm not saying anything about that."

¶30. On cross-examination, Milward was asked to review exhibits D-15, D-16 and D-17. They were identified as pictures taken by Milward's counsel, on September 23, 1998. The pictures showed the crossbuck sign, white stop bay and the railroad crossing. The photographs were used by the defense in the following line of questioning.

¶31. The defense counsel had Milward read from his deposition at trial as follows:

> Q. Here's your deposition, Mr. Milward. If you will turn to page 65 . . .
> QUESTION: "Okay, the crossbuck sign at the railroad track, did you see - -
> ever see it that day," and what was your answer?

10

A.    ANSWER: "No, sir."

Q.    QUESTION: "Okay. Are you saying that it wasn't there or that the rain was so bad you couldn't see it?"  Now, tell the jury what your answer was right there, to that question.

A.    ANSWER: "It was raining so hard and it was so dark I could not see the sign. I could not see it."

¶32.    The defense further questioned Milward regarding the white stop bar on the roadway, pictured in D-15, and whether the weather prevented him from seeing the stop bar and the train as follows:

Q.    As you were approaching this crossing, Mr. Milward, you never saw this white stop bar, did you? . . .

Q.    And your only explanation for not seeing that white bar on the roadway on the day of the accident, even though you're looking down to the right on the road, is because of the extreme weather conditions?

A.    That's true.

Q.    You agree with me, Mr. Milward, that had the weather not been bad as it was that night, there would have been no reason that you couldn't have seen a train coming out of the south headed north?

A.    That's true.

¶33.    We find that the trial court erred in denying Illinois Central's motion for J.N.O.V.  Milward's counsel informed the trial court that the case was strictly a crossing case.  The record reflects that Milward failed to establish the necessary elements to establish a claim against Illinois Central.  Milward's own testimony established that he drove into the side of the train due to the weather conditions.  Milward's testimony even contradicted the testimony of his expert witness, Dr. Heathington.  Milward testified that, but for the weather conditions, he could have seen the train.

¶34.    Milward's testimony centered on his impairment based on the weather conditions.  Milward testified that he had been drinking that evening.  He also stated that he would not have considered pulling off the road or stopping under any condition.  His testimony provided that he was not looking forward when he hit the side of the train, his windshield wipers did not clear the rain and his headlights

11

could not penetrate the rain. He was familiar with the area and knew he was approaching the train tracks.

¶35. Therefore, based on the lack of evidence to support a claim against Illinois Central, we find that the trial court erred in denying Illinois Central's motion for J.N.O.V. Based on Milward's own testimony, the testimony of Dr. Stafford, toxicologist, as to Milward's blood alcohol content and the effect on his ability to drive, and the testimony of Hatfield, the paramedic on the scene, who smelled alcohol and observed Milward's slurred speech, the trial court erred in denying the motion for J.N.O.V. Milward argues that the railroad conceded negligence in its failure to maintain the crossbuck with reflective material. While this may be true, more is required of the plaintiff than to simply prove negligence. In order to recover for injuries sustained, a plaintiff must provide evidence that the negligence proximately caused or contributed to the injuries. *Busick v. St. John*, 856 So. 2d 304, 307 (Miss. 2003).

¶36. Where, as here, a defendant is negligent per se for violation of a statute, the finding of negligence per se applies only to the duty and the breach of duty elements. The plaintiff is still required to prove that the defendant's breach of duty proximately caused the damages. *Gallagher Bassett Servs. Inc. v Jeffcoat*, 887 So. 2d 777, 787 (Miss. 2004) (Collecting authorities).

¶37. We have held that a proximate cause of an injury is "that cause which in natural and continuous sequence unbroken by any efficient intervening cause produced the injury and without which the result would not have occurred." *Gulledge v. Shaw*, 880 So. 2d 288, 293 (Miss. 2004) (citing *Delahoussaye v. Mary Mahoney's, Inc.*, 783 So. 2d 666, 671 (Miss. 2001)).

12

¶38. The question of whether the defendant's negligence was a proximate contributing cause of the plaintiff's injuries is ordinarily one for the jury. *Id*. However, in the case sub judice, the plaintiff was legally intoxicated. He was driving at night in a severe rain and wind storm with virtually no visibility. Under these circumstances, we hold as a matter of law that the absence of reflective material on the crossbuck was not a substantial factor in the plaintiff's injuries. Accordingly, the railroad's negligence was not a proximate contributing cause. The remaining issues raised on appeal by Illinois Central need not be addressed.

### CONCLUSION

¶39. Therefore, we reverse the judgment of the Quitman County Circuit Court, and we render judgment here in favor of Illinois Central that William K. Milward take nothing and that his complaint and this action are finally dismissed with prejudice.

¶40. **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**