# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01883-COA

| | |
|---|---|
| THOMAS E. CHAPMAN AND BRENDA CHAPMAN | APPELLANTS |

v.

| | |
|---|---|
| COCA-COLA BOTTLING CO., CONSOLIDATED, AMERICAN CASUALTY COMPANY OF READING, PA. AND CNA CLAIMPLUS, INC. | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/2013 |
| TRIAL JUDGE: | HON. RICHARD W. MCKENZIE |
| COURT FROM WHICH APPEALED: | JASPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN HINTON DOWNEY |
| | THOMAS L. TULLOS |
| ATTORNEYS FOR APPELLEES: | H. BENJAMIN MULLEN |
| | H. WESLEY WILLIAMS III |
| | BRITTNEY PINKHAM THOMPSON |
| | JOHN A. BANAHAN |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| TRIAL COURT DISPOSITION: | GRANTED SUMMARY JUDGMENT IN FAVOR OF APPELLEES |
| DISPOSITION: | AFFIRMED: 03/17/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.    Thomas and Brenda Chapman appeal the grant of summary judgment to Coca-Cola

Bottling Company (Coke), American Casualty Company (American Casualty), and CNA

ClaimPlus (CNA).  We affirm.

FACTS AND PROCEDURAL HISTORY

¶2.     On June 4, 2001, Thomas, while working as a route salesman for Coke, injured his back when building a display at a store in Bay Springs, Mississippi. Thomas called the Coke plant manager, Willie Meador, who instructed him to go to Occupational and Rehabilitative Associates LLC (ORA), for evaluation and treatment.

¶3.     At ORA, Thomas saw Dr. Rob Coleman, who prescribed epidural-steroid injections and continued him on muscle relaxers, which Thomas took due to a prior injury. Thomas previously injured his lower back while working at Coke in 1991. Thomas was also in a vehicle rollover accident in 2000.

¶4.     Dr. Coleman further recommended that Thomas undergo physical therapy at Southeastern Regional Medical Center. When Thomas returned to work, he was placed on light duty. However, despite being placed on light duty, he was unable to perform his assignments without help from other employees, and he eventually left Coke.

¶5.     After administering some treatment, Dr. Coleman referred Thomas to Dr. David Lee, a neurosurgeon at the Southern Neurological Institute in Hattiesburg, Mississippi. Thomas first visited Dr. Lee on July 14, 2001. Subsequently, Dr. Lee performed decompression back surgery on Thomas on August 28, 2001. Dr. Lee found that Thomas reached maximum medical improvement on March 15, 2002.

¶6.     After Thomas's June 4, 2001 incident, Tammy Saul, an administrator at Coke, submitted an "Employer's First Report of Injury or Occupation Disease" (B3) form on June 6, 2001. Based on Coke's B3 form, CNA, as American Casualty's claims adjuster, opened an active investigation file. Coke initially approved some of Thomas's medical expenses.

However, Thomas's doctors at ORA determined that Thomas's injuries resulted from a preexisting condition and not the June 4, 2001 incident.

¶7.    In a letter dated June 26, 2001, ORA reported to Coke:

> The doctors of our clinic have all reviewed the chart of Mr. Thomas Chapman and are all in agreement that Mr. Chapman's condition is not work-related but it is aggravated by work. We have reviewed the MRI done by our clinic and reviewed the MRI that was done previously. We feel that all of his injuries are from previous accidents and no new injury was noted. We also agree that Mr. Chapman needs to continue to be off work as the condition is not caused by work but aggravated by work.

The report was signed by Dr. Ronnie Ali, head of ORA at the time.

¶8.    On June 29, 2001, Margaret Redferrin, an adjustor for CNA, spoke with Meador regarding Coke's information on the incident. Meador told Redferrin that Thomas's doctors indicated the injuries resulted from the 2000 vehicle accident and not the June 4, 2001 incident.

¶9.    On August 24, 2001, Redferrin spoke to Meador again, and Meador confirmed the previous determination that Thomas's injuries stemmed from the 2000 vehicle accident. After speaking with Meador and reviewing Thomas's medical records received by CNA at the time, Redferrin closed Thomas's file on September 17, 2001, after finding no workers' compensation claim existed.

¶10.    On July 31, 2002, Thomas filed a petition to controvert with the Mississippi Workers' Compensation Commission. After notice of the petition to controvert, Redferrin reopened Thomas's file on August 13, 2002.

¶11.    On December 16, 2005, the administrative judge held a hearing on the issues of

3

whether Thomas sustained a work-related injury to his back on June 4, 2001, the existence of temporary disability, and the reasonableness and necessity of medical treatments. Both sides presented medical testimony at the hearing.

¶12. The judge ruled that the injury was compensable and awarded past-due compensation for temporary total disability from June 6, 2001, through March 15, 2002. American Casualty, CNA, and Coke appealed the ruling to the Commission. The Commission heard the case on July 31, 2006, and affirmed the ruling by an order dated August 23, 2006.

¶13. On May 30, 2007, the parties agreed to, and the Commission approved, a settlement between the parties.

¶14. On April 21, 2008, Thomas and Brenda filed a complaint in circuit court against Coke, CNA, American Casualty, and ORA. The Chapmans claimed that Coke, CNA, and American Casualty acted in bad faith by wrongfully denying benefits that arose from Thomas's underlying compensable workers' compensation claim and refusing to pay Thomas's workers' compensation claim. The Chapmans also claimed that CNA wrongfully denied and delayed payments of medical bills as part of the agreed settlement. Further, the Chapmans asserted Coke, CNA, and American Casualty all conspired with ORA to provide a "sham" report in order to prevent workers' compensation payments.

¶15. ORA filed a motion for summary judgment, which the circuit court granted on April 30, 2013. The circuit court granted the motion in light of ORA's uncontested status as a dissolved corporation without assets. *See* Miss. Code Ann. § 79-4-14.21 (Rev. 2013). No appeal was taken from this decision.

4

¶16. After the completion of discovery, American Casualty and CNA filed a motion for summary judgment. Coke joined the motion. The circuit court granted summary judgment in favor CNA, American Casualty, and Coke, and issued a final order on November 6, 2013. It is from this decision that the Chapmans now appeal.

## STANDARD OF REVIEW

¶17. "We review the grant or denial of a motion for summary judgment de novo, viewing the evidence in the light most favorable to the party against whom the motion has been made." *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013).

¶18. Under a de novo review,

> summary judgment is appropriate if the evidence before the Court–admissions in the pleadings, answers to interrogatories, depositions, affidavits, etc.–shows there is no genuine issue of material fact, and the moving party is entitled to [a] judgment as a matter of law. This Court does not try issues on a [Mississippi] Rule [of Civil Procedure] 56 motion, but only determines whether there are issues to be tried. In reaching this determination, the Court examines affidavits and other evidence to determine whether a triable issue exists, rather than the purpose of resolving that issue.

*Harper v. Cal-Maine Foods Inc.*, 43 So. 3d 401, 403 (¶4) (Miss. 2010) (citations omitted).

## ANALYSIS

I. *Whether the circuit court erred in granting summary judgment to American Casualty and CNA.*

¶19. "[S]ummary judgment 'is appropriate when the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Buckel v. Chaney*, 47 So. 3d 148, 153 (¶10) (Miss. 2010) (quoting *Watson Quality Ford Inc. v. Casanova*, 999 So. 2d 830, 832

5

(¶7) (Miss. 2008)). Therefore, the Chapmans had the burden to provide sufficient evidence to show the existence of bad faith on the part of American Casualty and CNA.

### A.    American Casualty

¶20.    For a claimant to maintain a bad-faith claim against an insurer, he "must show that the insurer lacked an arguable or legitimate basis for denying the claim, or that the insurer committed a wil[l]ful or malicious wrong, or acted with gross and reckless disregard for the insured's rights." *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (¶9) (Miss. 2003) (citing *State Farm Ins. Co. v. Grimes*, 722 So. 2d 637, 641 (Miss. 1998)).

¶21.    However, the "fact that an insurer's decision to deny benefits may ultimately turn out to be incorrect does not in and of itself warrant an award of punitive damages if the decision was reached in good faith." *Id.* "Where an insurance carrier denies or delays payment of a valid claim, punitive damages will not lie if the carrier has a reasonable cause for such denial or delay." *Id.* (citation omitted).

¶22.    In order to sustain a bad-faith claim, the burden falls on the claimant to prove that the insurer either lacked a legitimate or arguable basis for denying his claim or that it committed a willful or malicious wrong or acted with gross and reckless disregard for his rights. *Id.*

¶23.    Thomas argues that American Casualty had no arguable basis for denying his claim and maliciously denied then delayed his workers' compensation payments. American Casualty counters that it retained an arguable basis for delaying his workers' compensation claims, which Thomas affirmed in his deposition.

¶24.    After the June 4, 2001 accident, American Casualty, through CNA, received

6

information that linked Thomas's medical treatments to a preexisting condition. Between June 4, 2001, and September 17, 2001, all information obtained by CNA indicated that Thomas had a preexisting condition, which did not require any payments under workers' compensation. CNA's adjuster Redferrin spoke with Coke's Meador on at least two occasions about Thomas's injury. These conversations indicated Coke believed Thomas's injury resulted from the 2000 vehicle accident, that medical insurance covered Thomas's medical bills relating to the June 4 incident, and no workers' compensation claim existed.

¶25. American Casualty also did not act in a wrong or malicious manner by denying Thomas's claim. Prior to the petition to controvert, American Casualty found Thomas's injury resulted from the 2000 vehicle accident, or at least found the source of his injury in dispute. Once Thomas filed a petition to controvert, the petition, by its very nature, placed the claim in further dispute until the Commission resolved the claim.

¶26. The claim remained in dispute until August 23, 2006, when the Commission affirmed the AJ's order, which ruled in favor of Thomas. The parties did not reach a final agreement on the amount of compensation until the Commission approved a settlement on May 30, 2007. Therefore, American Casualty correctly asserts an arguable claim existed from at least June 4, 2001, to August 23, 2006, when the Commission ruled, if not until May 30, 2007 when the parties finally settled.

¶27. Thomas admitted as much in his deposition on March 18, 2013:

> Question: All right. And so according to this document that you signed on your oath, there was a legitimate dispute between you and Coke and the insurance company for the workers' (sic) comp?

7

Thomas: Uh-huh, that's right.

Question: Okay.  That was true in May of 2007, right?

Thomas: That's what the date is, yes.

¶28.    In the settlement petition to the Commission referred to in Thomas's deposition, he attested that a legitimate or arguable basis for denying his claim existed.  In the petition, Thomas stated:

> *Petitioner would further show the Commission that there is a bona fide, legitimate dispute between Petitioner and his Attorney, on the one hand, and Employer [Coke] and Carrier [American Casualty]*, on the other hand *as to the nature and extent of disability, loss of wage earning capacity, and/or industrial loss, if any, of Petitioner, as to medical expenses, hospital expenses, and other expenses, extent of injuries, disability, loss of wage earning capacity, and/or industrial loss of Petitioner which is related to his employment with Employer, and as to the medical and disability status of Petitioner*, but that notwithstanding these disputes and acting through and on the advice of his Attorney, Petitioner has agreed to settle any and all workers' compensation claims against Employer and Carrier based on the following payments for indemnity and medical as follows: . . . .

(Emphasis added).    Further, the Petition stated:

> Petitioner would further show to the Commission that he has consulted with his Attorney as to all matters pertinent to this claim and that his Attorney has explained to him and Petitioner is aware of the hearing procedures afforded in such cases and the possibility that he might receive an award of a greater amount or lesser amount than agreed herein or an award of other relief and benefits if this matter were adjudicated.  Petitioner would further show to the Commission that his Attorney has explained and he understands and is aware of the prospects of recovery and the possibility of medical, hospital, and other expenses respecting this claim, *and the possibility of additional benefits and additional forms of relief against Employer and Carrier, and that these expenses and benefits, as well as all other expenses and benefits respecting this claim, will not be the responsibility of Employer and Carrier and/or either of them, and the possibility of additional expenses and benefits and additional*

8

*forms of relief against Employer and Carrier will hereby be precluded, if this settlement be approved,* even should the condition of Petitioner become changed hereafter.

(Emphasis added). The Petition also stated:

> Petitioner would further show the Commission that based on the facts as contended by Petitioner and considering the disputed nature of such facts and disputed medical condition respecting the claim herein, Petitioner and his Attorney feel it would be to Petitioner's best interest that he be authorized and empowered to make such settlement . . . .

Due to this acknowledgment and the status of the claim, the Chapmans cannot dispute the existence of an arguable claim prior to at least May 30, 2007.

¶29. Thomas also failed to show American Casualty committed a willful or malicious wrong or acted with gross and reckless disregard for his rights. Based on Coke's representations and CNA's investigations, American Casualty reasonably believed no workers' compensation claim existed. "The insurer's only obligation is to perform a prompt and adequate investigation of the claim and to deal with the claimant in good faith." *McKneely*, 862 So. 2d at 535 (¶15).

¶30. American Casualty, through CNA, conducted a reasonable investigation almost immediately after receiving the Coke's B3 form on the incident. American Casualty acted in good faith by speaking with Coke and reviewing pertinent documents. American Casualty did not receive further notice of a potential claim until Thomas's petition to controvert, and the investigation resumed. Therefore, American Casualty did not act in bad faith in its investigation of Thomas's workers' compensation claim.

¶31. The Chapmans also failed to show American Casualty conspired with ORA to

wrongfully deny Thomas's claim. "Under Mississippi law, 'a conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully.'" *Gallagher Bassett Servs. Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (¶37) (Miss. 2004) (quoting *Levens v. Campbell*, 733 So. 2d 753, 761 (Miss. 1999)). It is an essential element that an agreement exists between the coconspirators. *Id.*

¶32. No evidence indicates American Casualty communicated with ORA, much less conspired with ORA. Moreover, the circuit court granted, and the Chapmans did not contest, summary judgment to ORA. Without any substantive evidence showing American Casualty executed an agreement with ORA, the Chapmans cannot maintain a claim for civil conspiracy.

¶33. The Chapmans could not provide any evidence that American Casualty committed any act rising to bad faith or civil conspiracy. Because Brenda's claims are entirely derivative of the bad-faith and civil-conspiracy claims, we determine her claims failed to defeat summary judgment as well. Based on this insufficiency, the Chapmans failed to show a genuine dispute of material fact existed to overcome summary judgment.

        *B.*     *CNA*

¶34. The Chapmans bear a different burden in proving CNA, as American Casualty's claims adjuster, acted in bad faith. "The adjuster does not owe the insured a fiduciary duty nor a duty to act in good faith." *Bass v. Cal. Life Ins. Co.*, 581 So. 2d 1087, 1090 (Miss. 1991). Rather,

    [a]n adjuster has a duty to investigate all relevant information and must make

a realistic evaluation of a claim. However, an adjuster is not liable for simple negligence in adjusting a claim. He can only incur independent liability when his conduct constitutes gross negligence, malice, or reckless disregard for the rights of the insured.

*Id.* (internal citations omitted).

¶35. CNA conducted an adequate investigation of the claim in 2001, and reasonably concluded no workers' compensation claim existed until receiving notice of Thomas's petition to controvert. CNA remained in contact with Coke from the receipt of the B3 form until the first closure of Thomas's file. CNA also reviewed all materials provided by Coke with regard to the claim.

¶36. In addition, CNA promptly reopened Thomas's file upon receiving notice of Thomas's petition to controvert. CNA continued investigating throughout the proceedings, and reasonably delayed any payments until the Commission determined the compensability of Thomas's claim. Thus, any denial of compensation was neither grossly negligent, malicious, nor reckless until the dispute was resolved in favor of Thomas.

¶37. The Chapmans do not submit sufficient evidence that any action by CNA amounted to negligence, much less gross negligence. Without anything more than mere assertions, the Chapmans failed to meet their burden. For similar reasons to American Casualty, the Chapmans' civil-conspiracy claim and Brenda's claims fail. Therefore, we find the circuit court did not err in granting summary judgment to CNA.

    II.    *Whether the circuit court erred in granting summary judgment to Coke.*

¶38. To prove an employer act in bad faith by denying a workers' compensation claim, a

11

claimant must prove the same elements for bad faith by an insurer. *See Southern Farm Bureau Cas. Ins. Co. v. Holland,* 469 So. 2d 55, 59 (Miss. 1984) (allowing bad-faith-refusal claim against insurer as an independent tort outside workers' compensation remedies); *Luckett v. Miss. Wood Inc.*, 481 So. 2d 288, 290 (Miss. 1985) (extending application of bad-faith-refusal claim to an employer).

¶39. Coke and American Casualty contracted for workers' compensation coverage. As part of that coverage, American Casualty bore the responsibility to fully investigate each workers' compensation claim and determine the compensability of a claim. Though the contract required Coke to pay up to $250,000 of a claim, American Casualty had to pay the initial claim, with Coke reimbursing American Casualty up to that amount. Due to this contractual relationship, the Chapmans could not prove Coke acted in bad faith if American Casualty and CNA did not.

¶40. Even outside of the contract, Coke did not act in bad faith because an arguable claim existed. Coke contested Thomas's injury as a preexisting condition, with the dispute continuing through contravention. Coke also fulfilled its duty in promptly reporting Thomas's incident to American Casualty, which then delegated the claim to CNA as its claims adjuster. Further, Coke fully cooperated with CNA in its investigation.

¶41. The dissent relies on *Mississippi Power & Light Co. v. Cook*, 832 So. 2d 474 (Miss. 2002). Thomas does not cite *Cook*. Similar to this case, in *Cook*, the claimant's claim was filed, settled, and approved by the Commission. *Id*. at 478 (¶4). However, unlike this case, the court noted that "in the settlement Cook reserved the right to bring a bad[-]faith claim

12

against MP&L." *Id.* Here, Thomas settled his claim but did not reserve the right to bring a bad faith claim. I am of the opinion that *Cook* offers no guidance here.

¶42. The Chapmans offer no substantive evidence to show Coke's actions amounted to bad faith in its investigation or in its dispute of the claim. The Chapmans also provide no support beyond mere allegations of Coke conspiring with ORA to deprive benefits. Because of this lack of evidence, the Chapmans failed in their burden to overcome summary judgment.

¶43. For these reasons, we affirm the grant of summary judgment in favor of American Casualty, CNA, and Coke.

¶44. **THE JUDGMENT OF THE JASPER COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., AND JAMES, J.; MAXWELL, J., JOINS IN PART. FAIR, J., NOT PARTICIPATING.**

**IRVING, P.J., DISSENTING:**

¶45. I cannot agree that the circuit court did not err in granting summary judgment in favor of the appellees, because it appears rather clear to me that a proper and thorough examination of the facts presented shows the existence of a genuine issue of material fact with respect to whether the appellees had an arguable basis for denying Thomas's claim. Therefore, I dissent. To put into prospective why it is clear to me that summary judgment was improperly granted, I must cite extensively the facts, which show—contrary to the majority's view—that the appellees did not conduct any significant investigation until after Thomas filed his

13

petition to controvert, which was over a year after his work-related injury.

¶46. On June 4, 2001, Thomas was building a display at the Jitney Jungle store in Bay Springs while working as a route salesman for Coke. As he attempted to pick up soft drinks to place in the display, he heard his back "pop," and he collapsed. Several individuals witnessed the incident, including the manager on duty at the Jitney Jungle. Thomas called Coke's plant manager, Willie Meador, and Willie instructed him to go to ORA for evaluation and treatment. Thomas followed Willie's instructions and went to ORA, where he saw Dr. Coleman. Dr. Coleman prescribed epidural-steroid injections and physical therapy at Southeastern Regional Medical Center, and continued Thomas on muscle relaxers that Thomas was taking due to a prior injury. Dr. Coleman eventually referred Thomas to Dr. Lee, and Thomas first visited Dr. Lee on July 14, 2001.

¶47. Prior to the June 4, 2001 incident, according to the record, Thomas injured his lower back in 1991, while working in the scope of his employment with Coke. He had been taking daily prescription medication, Flexiril, for his back pain since the 1991 incident. Thomas was also in a rollover accident in August 2000 while on vacation and, according to his affidavit, missed a day of work. After the June 4, 2001 Jitney Jungle incident, Thomas returned to work and was placed on light duty. However, despite being placed on light duty, he was unable to perform his assignments without help from other employees.

¶48. Tammy Saul, an administrator at Coke, submitted an "Employer's First Report of Injury or Occupation Disease" form on June 6, 2001. On June 11, 2001, Saul told the

14

Southeastern Medical Center that Thomas's physical therapy[1] was covered under workers' compensation. A few days later, Lloyd Boleware, a Coke supervisor, approved payment of the steroid injections under Coke's workers' compensation insurance. On June 24, 2001, Coke noted in Thomas's file that his employment status had changed, effective June 19, 2001, to a new status of "Workers' Compensation."[2]

¶49. In a letter dated June 26, 2001, ORA reported to Coke:

> The doctors of our clinic have all reviewed the chart of Mr. Thomas Chapman and are all in agreement that *Mr. Chapman's condition* is not work-related but it *is aggravated by work.* We have reviewed the MRI done by our clinic and reviewed the MRI that was done previously. *We feel that all of his injuries are from previous accidents* and no new injury was noted. *We also agree that Mr. Chapman needs to continue to be off work as the condition is* not caused by work but *aggravated by work.*

(Emphasis added). The report was signed by Dr. Ali.

¶50. On June 29, 2001, Redferrin entered notes into Thomas's electronic claim file, which stated:

> *Discussed claim with Willie at Coca-Cola in Laurel, Mississippi . . . . Willie advised [Thomas] rolled a van about 3 times (totaled the van)[.] [Thomas] is off 3 weeks. The doctor has indicated his condition is not work related but aggravated a pre-existing condition.* [Thomas] is currently drawing short term disability thru Coca[-]Cola. Willie will fax the report to me.

(Emphasis added). On August 1, the record reflects that the following note was entered in

---

[1] Presumably this is how CNA entered into the picture, as it is the "adjusting arm" charged with investigating, administering, and adjusting claims filed under the American Casualty insurance policy.

[2] The record does not shed further light on this status change. However, it appears that Thomas was recategorized from his regular salary to workers' compensation benefits.

Thomas's file:

> [T]ransferred this claim to Adjuster Redferrin for investigation. Make all contacts to determine compensability for all factors. Description of this claim is [that the injured worker] bent over to pick up an object and felt pop in back. When did [injured worker] have the auto accident? It appears that we have 2 different incidents. Was the [injured worker] in a company van? Determine what is caused from this on the job injury and what is from the van accident? Which is he losing time from? Document plan of action to move to resolution. Review to verify coding.

On September 17, 2001, according to Redferrin's notes, she closed Thomas's file.[3]

¶51. In the meantime, beginning on July 14, 2001, Dr. Lee treated Thomas at the Southern Neurological Institute. After conservative treatment failed, Dr. Lee performed decompression back surgery on Thomas, and on March 15, 2002, Dr. Lee found that Thomas had reached maximum medical improvement. Coke did not pay for the services rendered by Dr. Lee.

¶52. Between June 11, 2001, which apparently was the date that American Casualty and CNA were notified of Thomas's injury, and August 2002, American Casualty and CNA did not conduct any serious investigation of Thomas's injury—they did not even interview Thomas. And even after July 31, 2002, the date Thomas filed a petition to controvert with the Mississippi Workers' Compensation Commission (Commission), the appellees did not do any serious investigation and continued to deny that Thomas was entitled to benefits. I

_____

[3] The record reflects two other important entries that CNA made in Thomas's file. I quote those two entries during my discussion of American Casualty and CNA's argument that they possessed an arguable basis for denying Thomas's claim. However, neither entry shows that Redferrin conducted an investigation.

16

should note that Coke initially accepted that Thomas's injury was work related, but changed that position after receiving ORA's report on June 26, 2001.

¶53.    On December 16, 2005, issues of whether Thomas sustained a work-related injury to his back on June 4, 2001, the existence of temporary disability, and the reasonableness and necessity of medical treatments were brought before an administrative judge (AJ).  Both sides presented medical testimony at the hearing.  The AJ ruled that the injury was compensable and awarded past-due compensation for temporary total disability from June 6, 2001, through

March 15, 2002.  The defendants appealed the ruling to the full Commission, which heard the case on July 31, 2006, and affirmed the AJ's ruling in toto.

¶54.    A hearing date was set for January 2007 to determine the compensation for permanent disability, but was postponed.  In May 2007, the parties agreed to, and the Commission approved, the 9(i) settlement[4] between the parties for $111,000 for Thomas's claim for permanent loss of wage-earning capacity plus payment of all outstanding medical bills, including bills from Dr. Lee at the Southern Neurological Institute, and from the University Medical Center.

¶55.    On April 21, 2008, Thomas and Brenda filed, in the circuit court, their original complaint against the appellees.  In the complaint, Thomas and Brenda alleged that Coke,

---

[4] The parties to a claim may enter into a compromise settlement of a claim whether it is controverted or noncontroverted. When the parties have entered into compromise settlement of a claim pending at the Commission, the parties must submit an agreed petition for approval of compromise settlement to the Commission.

17

American Casualty, CNA, and ORA had engaged in a conspiracy to deny Thomas workers' compensation benefits, and had refused payment in bad faith.

¶56.   In May 2008, the defendants removed the case to the United States District Court for the Southern District of Mississippi. The case remained in the federal district court until August 31, 2011, when it was finally remanded to the circuit court.

¶57.   After completing discovery, American Casualty and CNA moved for summary judgment, and Coke joined the motion. On September 20, 2013, the circuit court, without stating its reasons, granted summary judgment in favor of all defendants, leading to this appeal.

¶58.   As I read the majority opinion, it finds that summary judgment was properly granted because (1) between June 4, 2001, and September 17, 2001, all information obtained by CNA indicated that Thomas had a preexisting condition, which did not require any payments under workers' compensation; (2) prior to the petition to controvert, American Casualty found Thomas's injury resulted from the 2000 vehicle rollover accident, or at least found the source of his injury in dispute; (3) the claim remained in dispute until July 31, 2006, when the Commission ruled in favor of Thomas, and (4) the language attested to by Thomas in the 9(i) lump-sum petition is an acknowledgment by Thomas of the existence of an arguable claim from the date of the injury until May 30, 2007.

¶59.   With respect, I must say that the majority totally misses the mark. As to the majority's first point, I must say that the appellees had only two pieces of information—neither of which was the result of any investigation conducted by the appellees. The two pieces of

18

information were ORA's report and Coke's assertion that Thomas injury was caused by the 2000 rollover accident, an assertion that enjoys no evidentiary support in the record—either medical or testimonial.

¶60. The majority's second point—that "prior to the petition to controvert, American Casualty found Thomas's injury resulted from the 2000 vehicle accident, or at least found the source of his injury in dispute"—fares no better than its first point. Again, with respect, I must say this statement is simply false. What is true is that American Casualty simply accepted as true—without any investigation—Coke's false assertion that Thomas's injuries resulted from the 2000 rollover accident.

¶61. I am not sure what value the majority attaches to its third point—that the claim remained in dispute until May 30, 2007, when the Commission ruled in favor of Thomas. However, I reiterate that the Commission did not rule in favor of Thomas until July 31, 2006, which was more than five years after Thomas's injury and four years after Thomas filed his petition to controvert. Surely the majority is not asserting that a ruling in favor of Thomas somehow proves that the appellees had an arguable basis for denying the claim. But whatever significance the majority places on the span of time, it certainly does not explain any justification for not conducting any investigation during the thirteen months following Thomas's injury.

¶62. Finally, with respect to the majority's last finding—that the language in the 9(i) lump-sum-settlement petition is an acknowledgment by Thomas that an arguable claim existed until at least May 30, 2007—is just an erroneous finding with no undergirding in the record.

19

It appears clear to me that the majority, in making this finding, conflates two different and distinct things: (1) a bona fide, legitimate dispute as to the nature and extent of Thomas's permanent disability for the sole purpose of settling the extent of permanent disability and amount of compensation due, (2) the existence of an arguable basis for denying or refusing to pay the claim altogether. The two are not the same. The dispute with Coke—which is at the center of Thomas's bad-faith lawsuit—is not about the nature, extent, or severity of an admittedly work-related injury, but about whether Coke had an arguable basis for denying that Thomas had suffered a work-related injury at all. Therefore, that Thomas attested in the settlement petition to the existence of a bona fide, legitimate dispute between him and Coke as to the nature and extent of his permanent disability, loss of wage-earning capacity, and expenses is of no moment with respect to the ultimate issue—whether Coke had an arguable basis for denying Thomas's claim. Moreover, the lump-sum-settlement petition was aimed at settling the underlying workers' compensation claim, not a bad-faith claim that had not yet been brought. While the language in the settlement petition precludes Thomas from seeking additional worker's compensation benefits, there is nothing precluding Thomas from initiating a separate lawsuit for bad-faith refusal to timely pay the benefits, which is a separate tort claim. *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 479 (¶8) (Miss. 2002).

¶63. Additionally, there are two other problems with the majority's reliance on the lump-sum-settlement petition. First, Coke did not pay the benefits that Thomas was entitled to until it was forced to do so. Thomas was injured on June 4, 2001. The Commission ruled

in Thomas's favor on July 31, 2006, affirming in toto the decision of the AJ who earlier, in the face of strong opposition from Coke, had ruled in Thomas's favor. Therefore, for more than five years, Coke refused to pay benefits that were lawfully due Thomas and conducted no investigation for more than a year. Second, the 9(i) lump-sum-settlement agreement was executed in May 2007, in settlement of Thomas's claim for permanent disability. So, even if Coke had possessed an arguable basis for denying benefits, it did not have one at the time the agreement was signed by Thomas, because the Commission had already determined that Thomas was entitled to benefits, had awarded him temporary total benefits, and had set a hearing date for a determination of the amount of permanent benefits. Thus, when Thomas signed the settlement petition containing the subject language, he could not have been attesting that Coke possessed an arguable basis for denying benefits, as that was not an issue to be determined in the workers' compensation proceeding. I now turn to a discussion of why I think the evidence shows the existence of a genuine issue of material fact with respect to whether the appellees had an arguable basis for denying Thomas's claim.

> *Is there a genuine issue of material fact as to American Casualty and CNA's claim of an arguable basis for denying Thomas's claim?*

¶64. CNA and American Casualty rely upon the ORA report and the statement made by Willie to suggest they had a legitimate and arguable reason for denying Thomas's claim after initially finding it compensable. I do not find the ORA report definitive. First, I note that the ORA report states that "no new injury was noted[.]" This assessment of the June 4, 2001 incident is in direct conflict with what transpired at the Jitney Jungle, as it is undisputed that

21

Thomas heard a "pop" and collapsed, an event witnessed by several people. Thomas was replaced by another employee to finish the job at the Jitney Jungle. Thomas saw Dr. Coleman shortly after the incident, and, according to Thomas, Dr. Coleman confirmed that Thomas had suffered a back injury on June 4, 2001. Thomas was unable to resume his normal work after the incident.

¶65. In his nebulously written ORA report, Dr. Ali refers to "accidents" as the basis for Thomas's condition. The investigation into Thomas's claim is void of any attempt to speak with Thomas or review Thomas's medical reports to identify the "accidents"— one of which was the on-the-job accident at Coke in 1991. American Casualty and CNA further rely on Willie's statement that Thomas's injuries were all related to the 2000 rollover accident. First, Willie is not a physician. Second, there is no medical evidence to support Willie's statement diagnosing the cause of Thomas's condition. Nor can Willie's statement be reconciled with the ORA report, which refers to prior *accidents,* one of which undisputedly was the 1991 work-related accident. Thomas was finally deposed on March 18, 2003. In his deposition, he affirmed that he initially injured his back in the 1991 accident, which was work related. However, he explained that in the 2000 rollover accident, he did not suffer any injury or aggravation of his 1991 back injury. Despite the findings in the ORA report that Thomas's condition was related to prior accidents, there is no medical proof that Thomas suffered an injury in the 2000 rollover accident. Therefore, the assessment in the ORA report that Thomas's condition was related to prior *accidents* was either made up out of whole cloth or was the adoption of Coke's erroneous assertion in that regard.

22

¶66.   When properly considered, the ORA report at least supports a finding or determination that Thomas's June 4, 2001 incident aggravated his 1991 work-related injury.  An "[i]njury or death arises out of and in the course of employment even when the employment merely aggravates, accelerates, or contributes to the injury.  Thus, a claimant is entitled to benefits if the employment acts upon the claimant's pre-existing condition to produce disability." *Beverly Healthcare v. Hare*, 51 So. 3d 223, 230-31 (¶25) (Miss. Ct. App. 2010) (internal citations omitted).

¶67.   American Casualty and CNA[5] assert that, based on the facts and information before them, they had legitimate reasons to deny Thomas's claim.  They argue that had they known about the referral to Dr. Lee, they would have deposed him.  This seems to be a circular argument.  The fact that they did not know of the referral to Dr. Lee is indicative of their failure to investigate.  Dr. Coleman, the treating physician provided by Coke, referred Thomas to Dr. Lee.  Therefore, CNA and American Casualty could have easily learned of Dr. Lee's involvement in the case.

¶68.   American Casualty and CNA were "required to perform a prompt and adequate investigation and make a reasonable, good-faith decision based on that investigation." *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 534 (¶12) (Miss. 2003) (citing *Bankers Life & Cas. Co. v. Crenshaw,* 483 So. 2d 254, 276 (Miss. 1985))*.*  "Proper investigation . . . means obtaining all available medical information relevant to the policyholder's claim."

---

[5] Neither Thomas nor the appellees differentiate between American Casualty and CNA in their role in this bad-faith action.

23

*Lewis v. Equity Nat'l Life. Ins. Co.*, 637 So. 2d 183, 187 (Miss. 1994).

¶69.   The fact that Thomas was not urging that his medical bills be paid by workers' compensation for the year following his accident did not relieve American Casualty and CNA of their responsibility to promptly and properly investigate the claim.  CNA and American Casualty were aware Thomas was claiming that his June 4, 2001 accident at Jitney Jungle was work related, and they were charged with investigating Thomas's claim as early as June 2001.  Therefore, the fact that Thomas did not file his petition to controvert until July 31, 2002, provides no justification for their failure to investigate the claim for over a year prior to his filing the petition to controvert.

¶70.   In order to prevail on a bad-faith claim against American Casulty, the insurer, Thomas must show "that the insurer lacked an arguable or legitimate basis for denying the claim, or that the insurer committed a wil[l]ful or malicious wrong, or acted with gross and reckless disregard for the insured's right."   *McKneely,* 862 So. 2d at 533 (¶9).  As to an adjuster, such as CNA, the Mississippi Supreme Court has explained that

> an insurance adjuster, agent, or other similar entity may not be held independently liable for simple negligence in connection [with] its work on a claim.  Such an entity may be held independently liable for its work on a claim if and only if its acts amount to any one of the following familiar types of conduct: gross negligence, malice, or reckless disregard for the rights of the insured.

*Gallagher Bassett Servs. Inc. v. Jeffcoat*, 887 So. 2d 777, 784 (¶27) (Miss. 2004).  "Reckless is defined as careless, heedless, inattentive; indifferent to consequences." *Turner v. City of Ruleville*, 735 So. 2d 226, 228-29 (¶10) (Miss. 1999) (internal quotations omitted).  "For

24

conduct to be 'reckless' it must be such as to evince disregard of, or indifference to, consequences." *Id.* at 229 (¶10).

¶71.   American Casualty and CNA ceased their investigation in response to Meador's statement and the ORA report.  However, there can be no dispute that Meador's statement was false in material particulars, and the ORA report did not assert that Thomas was not entitled to any compensation.  By obtaining and reviewing Thomas's complete medical records; interviewing Thomas, and Thomas's *treating physicians,* Drs. Coleman and Lee; and ascertaining the source of Willie's statement that Thomas's condition was due solely to the rollover accident, the defendants would have learned that there was no arguable basis for denying the claim.

¶72.   When Dr. Lee was finally deposed in June 2004, approximately three years after Thomas's accident, the following colloquy occurred between him and Thomas's attorney:

> Attorney:   Assuming that he has had these degenerative problems in his back and has been able to go back to work and had hurt from time to time and has been off work from time to time – assuming all that to be true, how would you relate that to the June 4 '01 incident that led up to the surgery?
>
> Dr. Lee:   Well, once again, certainly from looking at his history and what he described and what I've been told that he has said, he had problems with his back dating back to 1991 with additional injuries in 2000. . . .  Apparently, he was able to do his job and pick up some drinks.  At some point his back went out. Something apparently happened to his back at the time.  He is just more apt to have an injury to his back because he has a bad back, so to speak.

This medical assessment by Dr. Lee was crucial to the determination of whether Thomas had

25

suffered a work-related injury.

¶73. Of particular interest is the fact that CNA knew that despite the information it had received from Coke—that the June 4, 2001 accident "[was] not a work[ers'] comp[ensation] accident"—it needed to investigate further based on its policy guidelines. And as far as I can tell from the record, it failed or refused to do so. That CNA was aware of the need to further investigate is shown by the following notation, entered in Thomas's file by CNA on August 1, 2001:

> Norma, Coke charges each location for claims they have which are compensable. I received an email from the branch in regard to this claim. The branch has stated that this is not a work comp accident, but I need to get the details from you. *Was the auto accident a Coke accident that aggravated a pre-existing injury? Is this a compensable work comp claim?* Any detail you can give me will help. Even if you have questions at this point as to the validity, I can give this information back to the branch manager.

(Emphasis added).

¶74. Later in the same day when the above notation was entered in Thomas's file, his case was referred to CNA employee Redferrin. It appears that Redferrin was directed to "make all contacts to determine compensability for all factors." She was advised that the injured worker, Thomas, "bent over to pick up an object and felt a pop in his back." Redferrin was directed to ascertain when the auto rollover accident occurred, as "[i]t appears that we have 2 different accidents." She also was directed to "[d]etermine what is caused from this on the job injury and what is from the van accident[.]" And finally, she was instructed to determine "[w]hich [accident Thomas was] losing time from[.]" There is nothing in the record indicating that Referrin followed up as the file notation indicates she was instructed to do,

26

for the next notation in Thomas's file is the following notation, entered on August 24, 2001, by Redferrin:

> Called insured and spoke with Willie Meador[;] Willie advised this is not a workers compensation claim as employee had been in a serious vehicle accident and seriously injured his back. All medical bills have been made [sic] by his medical insurance. All doctors involved with the back injury reviewed all medical records and are all in agreement that [Willie]'s condition is not work-related but slightly aggravated by work. They reviewed the MRI report that was done previously and believe that all of his injuries are from the previous auto accident and no new injury [was] wsnoted. The claim was set up as a matter of [r]ecord only. No payments [are] to be made. Employee had major back problems before this slight problem[,] and doctors all agree the problems are due to the auto accident and no work comp injury. *Employee is currently off work due to the auto accident[,] which is in no way related to this alleged claim. All doctors advised the complaints are not work related.*

(Emphasis added). Clearly, as the above notation indicates, Redferrin conducted no independent investigation, choosing to talk only to Willie, Coke's employee, and to accept his assessment of how the claim should be handled, as she concluded that "[t]he claim was set up as a matter of record only." American Casualty and CNA do not attempt to explain why no follow-up investigation was done to determine the accuracy of Willie's assertion that Thomas's injuries were not work related. This failure alone raises a genuine issue as to whether American Casualty and CNA can legitimately argue that they had an arguable basis for denying Thomas's claim, unless they were contractually prohibited from investigating facts brought to their attention by Coke, a position that Coke denies.

¶75. American Casualty and CNA also rely on Thomas's deposition wherein Thomas agreed that there was a legitimate dispute between him, Coke, and the insurance company. Clearly there was a dispute between Thomas, Coke, American Casualty, and CNA over the

27

payment of Thomas's workers' compensation claim stemming from the June 4, 2001 accident. However, acknowledging the existence of a legitimate dispute does not equate to acknowledging that an arguable basis existed for their denying the claim, which is the basis of Thomas's bad-faith lawsuit. Further, according to the excerpts of Thomas's deposition that were provided in the record on appeal, Thomas was never asked if he believed American Casualty and Coke had an arguable basis for denying his claim. Moreover, Thomas's deposition was taken after he had filed his petition to controvert.

¶76. In *Crenshaw*, a case cited by Thomas, but admittedly not a workers' compensation case, Crenshaw, the insured, suffered an injury to his right foot. The foot became much worse, progressively losing circulation and, eventually, requiring amputation. *Crenshaw,* 483 So. 2d 257. When Crenshaw submitted a claim to his accidental-injury carrier, Bankers Life & Casualty Company, Bankers Life failed to conduct any investigation and, relying on three medical forms, which did not include all the information Banker's Life normally required to make a coverage determination, Bankers Life denied the insured's claim. *Id*. Crenshaw then sued. After reviewing the evidence, the trial court held that Bankers Life had acted in bad faith in denying the insurance claim, and our supreme court affirmed. *Id*. at 277.

¶77. The *Crenshaw* court, citing *Peerless Insurance Co. v. Myers*, 192 So. 2d 437 (Miss. 1966), affirmed that

> recovery may be had where the accidental injury aggravates, renders active, or sets in motion a latent or dormant pre-existing physical condition or disease, which in turn contributes to the disability or death for which recovery is sought, and where the accidental injury is a proximate cause of the resulting loss.

28

*Crenshaw*, 483 So. 2d at 270.

¶78.    Interestingly, in *Crenshaw,* the court also outlined the extensive investigative procedure set forth for a claim inquiry that Bankers Life failed to follow.  As Coke argues in attempting to shift blame to American Casualty and CNA, it is undisputed that American Casualty and CNA did not follow the guidelines established in the "Special Handling Instructions."

> *Is there a genuine issue of material fact as to Coke's claim of an arguable basis for denying Thomas's claim?*

¶79.    Coke argues that CNA conducted its own investigation and made its own determination to dispute the claim.  Coke also submits that there was a legitimate and arguable basis to dispute Thomas's claim, and even assuming Willie had requested that CNA deny the claim, CNA should have independently determined whether the claim was compensable.  On this last point, I do not disagree with Coke's position, but that is an argument for why CNA's and American Casualty's inactions should be scrutinized by a jury for a determination as to whether they acted in bad faith, not a shield for Coke in light of its action in providing patently false information to CNA and American Casualty.

¶80.    Coke also points to the "Special Handling Instructions" section in the workers' compensation policy with American Casualty and CNA, which explains how a claim involving a back injury should be handled.  The "Special Handling Instructions" state, in pertinent part:

Workers' Compensation

- Communication with the insured for the purpose of obtaining information and completing claim investigations should be coordinated with local Coca-Cola representatives.

- 24-hour Contact - Contact the local Coca-Cola contact representative and claimant within 24 hours of receipt of claim is mandatory for:
  Lost Time Injury Claims
  All Back Claims
  All Knee Claims
  Heart Attack and Hearing Loss
  Disability Expected to Exceed 21 Days or As
  Required by Coca-Cola Representative

- 48-Hour Contact with Treating Physician - Once it is determined that the Claimant's disability will exceed the waiting period, 48 hour contact shall be made with the treating physician to determine the diagnosis, prognosis, restrictions and modified duty opportunities. Follow up with the doctor and rehabilitation nurse will take place every 30 days or earlier. Ongoing disability shall be documented through monthly reports from the treating physician.

- All bills for the Coke account are to be sent to Corvel for bill review/repricing. Medical notes should accompany bills. Inpatient/Outpatient hospital bills should have medical notes, itemization of charges and admission/discharge summaries attached. Inpatient bills should reflect the IC file number.

- Under no circumstances will the carrier pay a non-compensable claim without prior approval by Jim Woody.[6] Should such a request [come] from local operations, immediately refer to Jim Woody. Request from lease agrements, contracts, certificate of insurance, etc. should be sent to Jim Woody.

- Basic investigation will be completed within seven (7) days from the date of receipt of the claim and final investigation on the compensability issue completed within 14 days or earlier, as

---

[6] A claims manager at Coke.

determined by state law.

- A preliminary plan of action must be clearly identified and documented in the file within 14 days from receipt of the claim and updated every 30 days.

 - Recorded statements will be taken from the claimant and witnesses within 48 hours of receipt of the claim or acknowledgment of existence of a witness for the following:

 Questionable Cases
 Occupational Disease
 Cumulative Trauma
 Back Injury
 Head Injury

¶81.  According to Coke, the only time where input was required directly from Coke with respect to payment was with a "non-compensable claim."  Under the special-handling instructions, one bullet point states that "under no circumstance will the carrier pay a non-compensable claim without the approval by Jim Woody.  Should such a request [come] from local operations, immediately refer it to Jim Woody."  According to Coke, even though CNA determined Thomas's claim to be noncompensable, it never referred the issue to Jim Woody.  Coke argues that since CNA did not believe the claim needed to be paid, Coke had no duty to do anything further.  Coke lays responsibility with CNA and American Casualty to pay "promptly when due the benefits required of [Coke] by the workers' compensation law" in accordance with Coke's contract with American Casualty and CNA.  As stated, Coke makes a great argument why American Casualty's and CNA's actions should be subjected to the crucible of jury deliberation for a determination as to whether they acted in bad faith.  It may

31

also be an argument for indemnification of any loss Coke may have suffered were this a case where Coke was suing American Casualty and CNA for their failure to investigate Thomas's claim in accordance with the terms and conditions of the contract between American Casualty, CNA, and Coke. But that is not the case.

¶82. In *Mississippi Power & Light Co. v. Cook*, 832 So. 2d at 479 (¶9), the Mississippi Supreme Court set out the standard for a claim against an employer for damages for the refusal to pay compensation in bad faith. For a claimant to prevail, "there must be a determination as to whether there was a legitimate or arguable reason to deny the benefits, and/or that the denial constituted a willful or malicious wrong in disregard for [the claimant's] rights." *Id.* (citations omitted). In *Mississippi Power & Light Co.*, Cook, an employee of Mississippi Power and Light Co. (MP&L), received workers' compensation benefits from MP&L and medical treatment after an on-the-job injury. *Id*. at 478 (¶4). The doctors who treated Cook found that he had suffered a fifteen percent permanent impairment to his right shoulder. However, MP&L cut off Cook's benefits completely. *Id.* Eventually, Cook and MP&L reached a settlement, but Cook reserved the right to bring a bad-faith claim against MP&L. *Id.* Thereafter, Cook filed a complaint against MP&L, asserting, among other claims, that MP&L terminated his workers' compensation benefits in bad faith. *Id.* After a trial, the jury returned a verdict in favor of Cook, awarding both actual and punitive damages. *Id.* MP&L appealed to the Mississippi Supreme Court, arguing that there was no evidence "to show that MP&L ha[d] acted out of malice, with gross neglect or otherwise

32

tortiously." *Id.* at 480 (¶16). In affirming the jury's verdict,[7] the Mississippi Supreme Court stated that "the denial of benefits does not have to be wi[l]lful or malicious[,] but there may not be an arguable basis to deny the claims." *Id.* at 480-81 (¶16) (citing *Miller v. McRae's Inc.*, 444 So. 2d 368 (Miss. 1984)).

¶83.    Just as MP&L did in *Cook*, Coke initially accepted Thomas's claim as compensable and paid certain medical expenses, but thereafter terminated the payments. Further, just as reliance upon a medical report was involved in *Cook* in the denial of benefits, reliance upon a medical report is involved here in Thomas's denial of benefits. In *Cook*, the medical report provided that Cook had a fifteen percent permanent disability to his right arm.[8] In our case, the ORA report determined that Thomas's present condition, though not a new injury, was the result of the aggravation of injuries that occurred in prior accidents, one of which was work related.

¶84.    I find the existence of a genuine issue of material fact as to whether Coke had an arguable basis for refusing to pay compensation benefits to Thomas. This is so for two reasons. First, there is clear evidence that Coke had a substantial pecuniary interest to protect, because, according to the policy, the Laurel plant would be responsible for payment

---

[7] The supreme court affirmed the award of compensatory damages in toto but affirmed the award of punitive damages on the condition that Cook accept a remittitur of $500,000, or a new trial on the issue of punitive damages was ordered. *Cook*, 832 So. 2d at 487-88 (¶43).

[8] I note that there were several claims at issue in *Cook* that perhaps explain why MP&L denied benefits despite a medical report assessing a fifteen percent permanent disability.

33

up to the first $250,000. Second, ORA's report cannot be properly read to exclude coverage, even if the determination by the doctors—that the June 4, 2001 accident did not result in a new injury—is correct because our law has long been well settled that an on-the-job injury that aggravates a preexisting condition is compensable.

¶85. For the reasons presented, I dissent. I would reverse the summary judgment and remand this case for further proceedings.

**LEE, C.J., AND JAMES, J., JOIN THIS OPINION. MAXWELL, J., JOINS THIS OPINION IN PART.**